[No. S104543. Aug. 14, 2003.]

JOHN R. MacKINNON et al., Plaintiffs and Appellants, v.
TRUCK INSURANCE EXCHANGE, Defendant and Respondent.

## Counsel

Law Offices of Arthur W. Francis, Jr., and Arthur W. Francis, Jr., for Plaintiffs and Appellants.

Pahl & Gosselin, Stephen D. Pahl and Servando R. Sandoval for California Apartment Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Menter & Witkin, Timothy S. Menter and Gene M. Witkin as Amici Curiae on behalf of Plaintiffs and Appellants.

Zevnik Horton, Michel Y. Horton, Charles J. Malaret and Stanley H. Shure as Amici Curiae on behalf of Plaintiffs and Appellants.

Gordon & Rees, Christopher R. Wagner; Ropers, Majeski, Kohn & Bentley, Michael J. Brady; Sedgwick, Detert, Moran & Arnold, Lawrence E. Picone, Frederick D. Baker and Kirk C. Jenkins for Defendant and Respondent.

Hancock Rothert & Bunshoft, Paul J. Killion, Kathryn C. Ashton and Megan M. Griesbach for London Market Insurers as Amicus Curiae on behalf of Defendant and Respondent.

Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott; Wiley Rein & Fielding, Thomas W. Brunner and Theodore A. Howard for Steadfast Insurance Company as Amicus Curiae on behalf of Defendant and Respondent.

Wiley Rein & Fielding, Laura A. Foggan, John C. Yang, Elizabeth A. Eastwood; Bien & Summers and Elliot L. Bien for Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**MORENO, J.**—In this case, we consider the meaning of an exclusionary clause in a comprehensive general liability (CGL) insurance policy that excludes injuries caused by the "discharge, dispersal, release or escape of pollutants." Specifically, we are asked to determine whether that clause, a standard pollution exclusion clause, applies to exclude injury to a tenant resulting from a landlord's allegedly negligent use of pesticides on his property. We conclude that in order for an exclusionary clause to effectively exclude coverage, it " 'must be conspicuous, plain and clear' " (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271 [54 Cal.Rptr. 104, 419 P.2d 168]), and that the pollution exclusion in question does not plainly and clearly exclude ordinary acts of negligence involving toxic chemicals such as pesticides. Accordingly, we reverse the contrary judgment of the Court of Appeal.

## I. STATEMENT OF FACTS

The following facts are undisputed. Truck Insurance Exchange (Truck Insurance) issued a CGL insurance policy to John R. MacKinnon, for the period of April 1996 to April 1997. That policy obligated the insurer to pay "all sums for which [the insured] become[s] legally obligated to pay as damages caused by bodily injury, property damage or personal injury." The insurer must "pay for damages up to the Limit of Liability when caused by an occurrence arising out of the business operations conducted at the insured location." Under "Exclusions" the policy states: "We do not cover Bodily Injury or Property Damage (2) Resulting from the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants: (a) at or from the insured location." The terms "Pollution or Pollutants" are defined, in the definitions section at the beginning of the policy, as "mean[ing] any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste materials. Waste materials include materials which are intended to be or have been recycled, reconditioned or reclaimed."

Jennifer Denzin was a tenant in MacKinnon's apartment building. She requested MacKinnon to spray to eradicate yellow jackets at the apartment building. MacKinnon hired a pest control company, Antimite Associates, Inc. (Antimite), to exterminate the yellow jackets. Antimite treated the apartment building for yellow jackets on several occasions in 1995 and 1996. On May 19, 1996, Denzin died in MacKinnon's apartment building.

Denzin's parents filed a wrongful death lawsuit against MacKinnon, Antimite, and other defendants. They alleged that on or about May 13, 1996, defendants negligently failed to inform Denzin that her apartment was to be sprayed with "dangerous chemicals," and failed to evacuate her, as a result of which she died from pesticide exposure. MacKinnon tendered his defense to Truck Insurance under the CGL insurance policy.

On November 10, 1997, Truck Insurance retained counsel and filed a responsive pleading to the complaint on behalf of MacKinnon. On December 23, 1997, Truck Insurance sent MacKinnon a letter advising him that, because an immediate response was necessary, Truck Insurance had referred the Denzin action to defense counsel in order to protect MacKinnon's interests. Truck Insurance added that it was still investigating the matter to determine if coverage existed. Truck Insurance added that it did not intend to waive any provisions of the insurance policy, and "Truck [Insurance] reserves all of its rights under the terms, exclusions, and conditions of any policies issued to you."

On June 3, 1998, Truck Insurance sent MacKinnon a letter advising that it had concluded that the pollution exclusion precluded coverage for the Denzin action and therefore Truck Insurance would be withdrawing its defense within 30 days. Truck Insurance later extended the withdrawal date to July 20, 1998.

In June 1998, MacKinnon retained counsel to represent him in the Denzin action. MacKinnon, through his counsel, settled the Denzin action for $10,000 and then filed the instant insurance coverage action, claiming Truck Insurance owed MacKinnon a duty to defend and indemnify him in the Denzin action. MacKinnon's action asserted causes of action for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing.

Truck Insurance moved for summary judgment on MacKinnon's coverage claims on the ground the pollution exclusion contained in the insurance policy issued by Truck Insurance to MacKinnon precluded coverage for the Denzin suit. MacKinnon opposed the motion. The trial court granted summary judgment based on the following findings: (1) the Denzin action alleged the decedent died as a result of exposure to a pesticide used to eradicate

yellow jackets at her apartment building; (2) the pollution exclusion in the Truck Insurance policy was clear and unambiguous; (3) there was no potential for coverage for the Denzin action because the injuries alleged in the Denzin complaint were excluded from coverage by the pollution exclusion; and (4) because there was no potential for coverage, MacKinnon's breach of the good faith covenant cause of action also fails.

The Court of Appeal affirmed. It too found the clause unambiguous as applied to MacKinnon's claim, citing several cases from other jurisdictions giving the exclusion a broad reading. We granted review.

## II. DISCUSSION

In determining whether a summary judgment motion was properly granted, "we review the trial court's decision de novo, applying the rule that '[a] defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' " (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 279 [36 Cal.Rptr.2d 537, 885 P.2d 950].) The trial court's principal ground for granting summary judgment, and the Court of Appeal's principal ground for affirming the trial court, was a determination that the pollution exclusion found in MacKinnon's policy excluded coverage of Denzin's wrongful death complaint. As discussed below, interpretation of policy language is a question of law. We therefore must determine, de novo, whether the pollution exclusion was properly interpreted by these courts.

The meaning of the current pollution exclusion has not received wide attention in this state.[1] However, the scope of the exclusion has been litigated extensively in other jurisdictions. To say there is a lack of unanimity as to how the clause should be interpreted is an understatement. Although the fragmentation of opinion defies strict categorization, courts are roughly

---

[1] The two published Court of Appeal cases addressing the current pollution exclusion concern instances of traditional environmental industrial pollution, which neither side disputes is within the scope of coverage. (*Legarra v. Federated Mutual Ins. Co.* (1995) 35 Cal.App.4th 1472 [42 Cal.Rptr.2d 101] [groundwater contamination from petroleum plant]; *Titan Corp. v. Aetna Casualty & Surety Co.* (1994) 22 Cal.App.4th 457 [27 Cal.Rptr.2d 476] [groundwater contamination from manufacturing plant].) The same is true for federal cases applying California law. (See *East Quincy Services District v. Continental Ins. Co.* (E.D.Cal. 1994) 864 F.Supp. 976, 979–980 [groundwater contamination from sewage-borne bacteria]; *Staefa Control-System, Inc. v. St. Paul Fire and Marine Ins. Co.* (N.D.Cal. 1994) 847 F.Supp. 1460, as amended (1994) 875 F.Supp. 656 [groundwater contamination from former manufacturing plant]; *Hydro-Systems, Inc. v. Continental Ins. Co.* (C.D.Cal. 1989) 717 F.Supp. 700, affd. (1991) 929 F.2d 472 [hydrocarbon emissions from a manufacturing plant].) These cases do not consider the primary issue in this case—whether injuries outside the realm of such traditional forms of pollution are barred from coverage by the pollution exclusion.

divided into two camps. One camp maintains that the exclusion applies only to traditional environmental pollution into the air, water, and soil, but generally not to all injuries involving the negligent use or handling of toxic substances that occurs in the normal course of business. These courts generally find ambiguity in the wording of the pollution exclusion when it is applied to such negligence and interpret such ambiguity against the insurance company in favor of coverage. The other camp maintains that the clause applies equally to negligence involving toxic substances and traditional environmental pollution, and that the clause is as unambiguous in excluding the former as the latter.[2]

---

[2] Considering those jurisdictions that have taken a definitive position, as represented by a published opinion of the state supreme court, the narrower interpretation of the pollution exclusion appears to be in the majority. (See *American States Ins. Co. v. Koloms* (1997) 177 Ill.2d 473 [687 N.E.2d 72, 82, 227 Ill.Dec. 149] (*Koloms*) [Illinois Supreme Court held carbon monoxide leak from apartment furnace not excluded]; *American States Ins. Co. v. Kiger* (Ind. 1996) 662 N.E.2d 945, 949 [gasoline leak from commercial gas station not excluded]; *Associated Wholesale Grocers, Inc. v. Americold Corp.* (1997) 261 Kan. 806 [934 P.2d 65, 78–79] [property losses sustained from toxic smoke emitted from a fire not excluded]; *Doerr v. Mobil Oil Corp.* (La. 2000) 774 So.2d 119, 126–128 [accidental discharge of hydrocarbons from oil refinery not excluded]; *Sullins v. Allstate Ins. Co.* (1995) 340 Md. 503 [667 A.2d 617, 624] [injuries sustained from the ingestion of lead paint chips not excluded]; *Western Alliance Ins. Co. v. Gill* (1997) 426 Mass. 115 [686 N.E.2d 997, 999–1000] (*Gill*) [injuries sustained from exposure to carbon monoxide emitted from an oven not excluded]; *Westview Associates v. Guaranty National Ins. Co.* (2000) 95 N.Y.2d 334 [740 N.E.2d 220, 223, 717 N.Y.S.2d 75] [injuries sustained by a tenant from lead poisoning not excluded]; *Andersen v. Highland House Co.* (2001) 93 Ohio St.3d 547 [2001 Ohio 1607, 757 N.E.2d 329, 334] [injuries sustained from the inhalation of carbon monoxide emitted from a malfunctioning heater not excluded]; *Lititz Mutual Ins. Co. v. Steely* (2001) 567 Pa. 98 [785 A.2d 975, 982] (*Steely*) [injuries sustained from the ingestion of lead paint chips not excluded]; *Gainsco Ins. Co. v. Amoco Production Co.* (Wyo. 2002) 53 P.3d 1051, 1066 [death caused by hydrogen sulfide fumes accidentally emitted from a truck not excluded]; but see *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.* (Fla. 1998) 711 So.2d 1135, 1137, 1141 (*Deni Assocs.*) [injuries sustained from insecticide accidentally sprayed on bystanders are excluded]; *Sokoloski v. American West Ins. Co.* (1999) 294 Mont. 210 [980 P.2d 1043, 1046] [property losses sustained due to contamination from soot and smoke emitted from candles are excluded]; *Bituminous Casualty Corp. v. Cowen Construction, Inc.* (Okla. 2002) 55 P.3d 1030, 1035 [injuries sustained from exposure to lead negligently released into a kidney dialysis center are excluded]; *Madison Construction Co. v. Harleysville Mutual Ins. Co.* (1999) 557 Pa. 595 [735 A.2d 100, 108–110] [employee's injuries sustained from a fall caused by the inhalation of fumes from concrete curing compound are excluded]; *National Union Fire Insurance Co. of Pittsburgh, Pa. v. CBI Industries, Inc.* (Tex. 1995) 907 S.W.2d 517, 522 [property losses and injuries sustained from the accidental release of hydrofluoric acid from an oil refinery are excluded].)

It must also be recognized that the above categorization is an oversimplification, because the same court may fall into different camps depending on the situations presented. (See *Peace ex rel. Lerner v. Northwestern Nat'l Ins. Co.* (1999) 228 Wis.2d 106 [596 N.W.2d 429, 448] (*Peace*) [tenants' ingestion of lead paint chips excluded]; *Donaldson v. Urban Land Interests, Inc.* (1997) 211 Wis.2d 224 [564 N.W.2d 728, 733] (*Donaldson*) [carbon dioxide leak in apartment building not excluded].)

A. *Historical Background of Pollution Exclusion*

In order to understand the meaning of the pollution exclusion, some historical background is useful. The Illinois Supreme Court's comprehensive review of this history in *Koloms, supra*, 687 N.E.2d 72, merits extensive quotation: "The events leading up to the insurance industry's adoption of the pollution exclusion are 'well-documented and relatively uncontroverted.' [Citation.] Prior to 1966, the standard-form CGL policy provided coverage for bodily injury or property damage caused by an 'accident.' [Citations.] The term 'accident,' however, was not defined in the policy. As a result, courts throughout the country were called upon to define the term, which they often interpreted in a way as to encompass pollution-related injuries. In response, the insurance industry revised the CGL policy in 1966 and changed the former 'accident'-based policy to an 'occurrence'-based policy. The new policy specifically defined an 'occurrence' as 'an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury and property damage that was neither expected nor intended from the standpoint of the insured.' [Citation.] Despite these changes, courts continued to construe the policy to cover damages resulting from long-term, gradual exposure to environmental pollution . . . .

"Meanwhile, at about the same time, the United States Congress substantially amended the Clean Air Act in an effort to protect and enhance the quality of the nation's air resources. Pub.L. No. 91-604, 84 Stat. 1676 (1970) (now codified at 42 U.S.C. §§ 7401 through 7642 (1983), as amended). The passage of these amendments, which included provisions for cleaning up the environment, imposed greater economic burdens on insurance underwriters, particularly those drafting standard-form CGL policies. [Citation.] The insurer's burdens further increased with the . . . environmental disasters of Times Beach, Love Canal and Torrey Canyon. [Citations.]

"In the wake of these events, the insurance industry became increasingly concerned that the 1966 occurrence-based policies were 'tailor-made' to cover most pollution-related injuries. To that end, changes were suggested, and the industry proceeded to draft what was to eventually become the pollution exclusion . . . .

"The result of these efforts was the addition of an endorsement to the standard-form CGL policy in 1970 [adopted as exclusion (f)]. The endorsement provided in pertinent part:

" '[This policy shall not apply to bodily injury or property damage] arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or

other irritants, contaminants or pollutants *into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.'*

"During the next 13 years, various courts labored over the exact meaning of the words 'sudden and accidental.' Much of the litigation focused on whether the word 'sudden' was intended to be given a strictly temporal meaning such that, in order for the exception to apply, the discharge of pollution had to have been 'abrupt.' [Citation.] This controversy generated an enormous amount of litigation, leading one commentator to describe the dispute as one of 'the most hotly litigated insurance coverage questions of the late 1980's.' [Citations.] Not surprisingly, insurance companies responded by drafting a new version of the exclusion, which, first appearing in 1985, is now commonly known as the "absolute pollution exclusion." [3] . . . . The two most notable features of this latest version are (i) the lack of any exception for the 'sudden and accidental' release of pollution, and (ii) the elimination of the requirement that the pollution be discharged 'into or upon land, the atmosphere or any watercourse or body of water.' [Citation.]" *(Koloms, supra,* 687 N.E.2d at pp. 79–81, fn. omitted, italics added; see also *Jackson TP, etc. v. Hartford Acc. & Indem.* (1982) 186 N.J. Super. 156 [451 A.2d 990, 993–994] [noting the holding of a considerable number of courts that pollution would be regarded as "sudden and accidental" if "the result or injury was unexpected or unintended"].)

Even commentators who represent the insurance industry recognize that the broadening of the pollution exclusion was intended primarily to exclude traditional environmental pollution rather than all injuries from toxic substances. As two attorneys representing the insurance industry have concluded: "Insurers introduced the Absolute Exclusion in 1985 as a replacement for the Qualified Exclusion, principally in response to court decisions interpreting the Qualified Exclusion in favor of coverage. In particular, courts have noted that the revised pollution exclusion deleted the 'sudden and accidental' exception because some decisions had misapplied this exception or, at least, construed it in a manner contrary to insurers' original intent. By the mid-1980s a significant body of law had developed construing the 'sudden and accidental' exception to embrace gradual pollution. [¶] The courts' broad reading of the Qualified Exclusion's 'sudden and accidental' exception was at the forefront of insurers' concern at the time the Absolute Exclusion was drafted." (Shelley & Mason, *Application of the Absolute Pollution Exclusion to Toxic Tort*

---

[3] The pre-1985 clause is commonly referred to as the "qualified pollution exclusion" and post-1985 clause as the "absolute pollution exclusion." The exclusions are never designated as such in the insurance policies themselves, and to refer to the current clause as an *"absolute pollution exclusion"* is to suggest an answer to the very question we address. Accordingly, we will refer to the "current pollution exclusion" or simply the "pollution exclusion."

*Claims: Will Courts Choose Policy Construction or Deconstruction?* (1998)
33 Tort & Ins. L.J. 749, 753–754, fns. omitted (Shelley & Mason).)

Commentators have pointed as well to the passage of the Comprehensive
Environmental Response, Compensation, and Liability Act (CERCLA; 42
U.S.C. § 9601 et seq.) in 1980 and the attendant expansion of liability for
remediating hazardous wastes (see *AIU Ins. Co. v. Superior Court* (1990) 51
Cal.3d 807, 815–816 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU Ins. Co.*) as
motivation for amending the exclusion. "[T]he available evidence most
strongly suggests that the absolute pollution exclusion was designed to serve
the twin purposes of eliminating coverage for gradual environmental degrada-
tion and government-mandated cleanup such as Superfund response cost
reimbursement." (Stempel, *Reason and Pollution: Correctly Construing the
"Absolute" Exclusion In Context and in Accord with Its Purpose and Party
Expectations* (1998) 34 Tort & Ins. L.J. 1, 32 (Stempel).)

B. *Arguments For and Against a Narrow Interpretation of the Pollution
Exclusion Clause*

One of the primary arguments for a narrow interpretation of the pollution
exclusion is based on the history reviewed above. As *Koloms* stated: "Our
review of the history of the pollution exclusion amply demonstrates that the
predominate [*sic*] motivation in drafting an exclusion for pollution-related
injuries was the avoidance of the 'enormous expense and exposure resulting
from the "explosion" of *environmental* litigation.' [Citations.] Similarly, the
1986 amendment to the exclusion was wrought, not to broaden the provi-
sion's scope beyond its original purpose of excluding coverage for environ-
mental pollution, but rather to remove the 'sudden and accidental' exception
to coverage which, as noted above, resulted in a costly onslaught of litigation.
We would be remiss, therefore, if we were to simply look to the bare words
of the exclusion, ignore its *raison d'être*, and apply it to situations which do
not remotely resemble traditional environmental contamination. The pollution
exclusion has been, and should continue to be, the appropriate means of
avoiding ' "the yawning extent of potential liability arising from the gradual
or repeated discharge of hazardous substances *into the environment.*" '
([Italics] in original.) [Citations.] We think it improper to extend the exclu-
sion beyond that arena." (*Koloms, supra,* 687 N.E.2d at p. 81; accord,
*Doerr v. Mobile Oil Corp., supra,* 774 So.2d at pp. 126–128; *Sullins v.
Allstate Insurance Co., supra,* 667 A.2d 617, 622–623; *Andersen v. Highland
House Co., supra,* 757 N.E.2d at p. 334; *Gainsco Ins. Co. v. Amoco
Production Co., supra,* 53 P.3d at p. 1066; see also *Stempel, supra,* 34 Tort &
Ins. L.J. at pp. 35–40.)

Courts adopting a narrower interpretation of the exclusion have also
maintained that an interpretation of "pollutant" as applying literally to "any

contaminant or irritant" would have absurd or otherwise unacceptable results. "[T]here is virtually no substance or chemical in existence that would not irritate or damage some person or property." (*Westchester Fire Ins. Co. v. City of Pittsburg, Kans.* (D.Kan. 1991) 768 F.Supp. 1463, 1470 (*City of Pittsburg, Kans.*), affd. *sub nom. Pennsylvania Nat. Mut. Cas. Ins. Co. v. City of Pittsburg, Kan.* (10th Cir. 1993) 987 F.2d 1516; see also *Nautilus Ins. Co. v. Jabar* (1st Cir. 1999) 188 F.3d 27, 30–31 [interpreting Maine law]; *Pipefitters Welfare Education Fund v. Westchester Fire Insurance Co.* (7th Cir. 1993) 976 F.2d 1037, 1043 (*Pipefitters*); *Motorists Mut. Ins. Co. v. RSJ, Inc.* (Ky.Ct.App. 1996) 926 S.W.2d 679, 682 [437 Ky.L. Summary 4] (*RSJ, Inc.*).)

Another argument for this camp focuses on the common meaning of the term "discharge, dispersal, release or escape," as implying expulsion of the pollutant over a considerable area rather than a localized toxic accident occurring in the vicinity of intended use. (*Lumbermens Mutual Casualty v. S-W Industries, Inc.* (6th Cir. 1994) 39 F.3d 1324, 1336 (*Lumbermens*); accord, *Meridian Mutual Ins. Co. v. Kellman* (6th Cir. 1999) 197 F.3d 1178, 1185 (*Kellman*); *Center for Creative Studies v. Aetna Life & Casualty Co.* (E.D.Mich. 1994) 871 F.Supp. 941, 946 (*Center for Creative Studies*); *Steely, supra*, 785 A.2d at p. 982.) Other courts have viewed these words as terms of art describing environmental pollution. (*Western American Ins. Co. v. Tufco Flooring* (1991) 104 N.C.App. 312 [409 S.E.2d 692, 699–700] (*Tufco Flooring*), disapproved on other grounds in *Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.* (2000) 351 N.C. 293 [524 S.E.2d 558]; accord, *Sphere Drake Ins. Co. v. Y.L. Realty Co.* (S.D.N.Y. 1997) 990 F.Supp. 240, 244; *RSJ, Inc., supra*, 926 S.W.2d at p. 681; *Gill, supra*, 686 N.E.2d at p. 999; *Continental Casualty Co. v. Rapid-American Corp.* (1993) 80 N.Y.2d 640, 654 [593 N.Y.S.2d 966, 609 N.E.2d 506] [asbestos-related injury not excluded].)

On the other hand, many courts have taken a position that the current pollution exclusion is not ambiguous in encompassing acts of negligence involving toxic substances—acts that are outside the scope of traditional environmental pollution. These courts tend to find the meaning of the key words, as defined in a dictionary, to unequivocally cover forms of contamination other than traditional environmental pollution. This approach is exemplified by the Wisconsin Supreme Court in *Peace, supra*, 596 N.W.2d 429, in which the court determined, after extensive analysis of the dictionary definitions of the various terms, that a tenant' s action against the landlord for lead paint ingestion was excluded. As the court stated: "The words 'discharge,' 'dispersal,' 'release,' and 'escape' are not defined in the policy, but they appear to describe the entire range of actions by which something moves from a contained condition to an uncontained condition." (*Id.* at p. 438.) The court therefore concluded that ingestion of chipped lead paint was covered: "We believe the plain language of the policy covers the release of paint

containing lead from a wall or ceiling into the air or onto the floor. 'Common sense tells us that lead paint that never leaves a wall or ceiling does not cause harm.' " (*Id.* at pp. 438–439, fn. omitted.)

The *Peace* court also rejected the argument that the terms "discharge, dispersal, release or escape" are environmental law terms of art because they appear in environmental statutes: "A quick check of the Wisconsin Statutes shows that these terms are used in many situations completely unrelated to the environment, including criminal law. Citing a multitude of criminal justice statutes that use these common terms would not transform the terms into criminal justice terms of art." (*Peace, supra,* 596 N.W.2d at p. 446.)

The court also disagreed that the term "pollutant" is ambiguous. "The key term in the clause—'pollutants'—is specifically defined in the policy; the definition cannot be undone by different notions of 'pollution' outside the policy, unrelated to the policy language, unless such a 'reading' produced absurd results. In the text here, the words are not fairly susceptible to more than one construction. The pollution exclusion clause does not become ambiguous merely because the parties disagree about its meaning [citation], or because they can point to conflicting interpretations of the clause by different courts." (*Peace, supra,* 596 N.W.2d at p. 442; accord, *Deni Assocs., supra,* 711 So.2d at p. 1139.)

As for the intended purpose of the pollution exclusion, courts finding a lack of ambiguity in the language of the policy dismiss such history as irrelevant. "[U]nless we conclude that the policy language is ambiguous, it would be inappropriate for us to consider the arguments pertaining to the drafting history of the pollution exclusion clause. [Citation.]" (*Deni Assocs., supra,* 711 So.2d at p. 1139.)

C. *Principles for Construing Insurance Policies Under California Law*

We begin our own analysis with a review of the principles that govern the construction of insurance policy language in this state. ■ Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).) "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) The "clear and explicit" meaning of these

provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)' [Citations.] A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." (*Waller, supra* 11 Cal.4th at p. 18.)

Moreover, insurance coverage is " ' "interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] . . . exclusionary clauses are interpreted narrowly against the insurer." ' " (*White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881 [221 Cal.Rptr. 509, 710 P.2d 309].) "[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again 'any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.' [Citation.] Thus, 'the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language.' [Citation.] The exclusionary clause 'must be *conspicuous, plain and clear.*' " (*State Farm Mut. Auto Ins. Co. v. Jacober* (1973) 10 Cal.3d 193, 201–202 [110 Cal.Rptr. 1, 514 P.2d 953].) This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded. (*Gray v. Zurich Insurance Co., supra,* 65 Cal.2d at pp. 272–273.)[4] The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded. (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1188 [77 Cal.Rptr.2d 537, 959 P.2d 1213].)

---

[4] As one court has observed: "It is not altogether clear that the *conspicuous* and *plain and clear* requirements [for clauses limiting coverage] apply unless the exclusion 'disappoints the reasonable expectations' of the insured. Some cases couple the two statements in such a way as to suggest that only disappointed expectations will activate the conspicuous, plain and clear requirements. [Citations.] On the other hand, other decisions appear to require exclusions to comply with these requirements without any finding that implementation of the exclusion would 'disappoint the reasonable expectations' of the insured. [Citations.] We can imagine exclusions which are so consistent with the scope of coverage an ordinary policyholder expects that it would be unnecessary if not redundant to impose special requirements these clauses be *conspicuous* and *plain and clear*. Nonetheless many, and perhaps most, exclusionary clauses by their very nature deny coverage that consumers otherwise would personally anticipate to be provided under the policy." (*Ponder v. Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 720–721 [193 Cal.Rptr. 632], fn. omitted.) We have no occasion to decide whether certain exclusionary clauses are so consistent with policy coverage language that it would be "unnecessary if not redundant" to impose a requirement that the clauses be conspicuous, plain and clear. As explained below, such is not the case with the pollution exclusion at issue here.

## D. *The Meaning of the Pollution Exclusion*

■ Therefore, in order to ascertain the scope of an exclusion, we must first consider the coverage language of the policy. (See *Gray v. Zurich Insurance Co.*, *supra*, 65 Cal.2d at p. 273; *Ponder v. Blue Cross of Southern California*, *supra*, 145 Cal.App.3d at pp. 720–721.) MacKinnon's CGL policy obligated the insurer to pay "all sums for which [the insured] become[s] legally obligated to pay as damages caused by bodily injury, property damage or personal injury." We said of similar language that it "connotes general protection for alleged bodily injury caused by the insured." (*Gray v. Zurich Ins. Co.*, *supra*, 65 Cal.3d at p. 272.) This language establishes a reasonable expectation that the insured will have coverage for ordinary acts of negligence resulting in bodily injury. (*Id.* at p. 273.) Coverage will therefore be found unless the pollution exclusion conspicuously, plainly and clearly apprises the insured that certain acts of ordinary negligence, such as the spraying of pesticides in this case, will not be covered. (*Id.* at pp. 271, 273.)

Truck Insurance contends that the pollution exclusion, read literally, would plainly and clearly extend to virtually all acts of negligence involving substances that can be characterized as irritants or contaminants, that is, are capable of irritating or contaminating so as to cause personal injury. Specifically, they argue that pesticides are "chemicals" capable of causing irritation and can therefore be defined as an "irritant" and a "pollutant." The spraying of pesticides can be described as a "discharge" or "dispersal."

■ But Truck Insurance's reading of the clause is predicated on a basic fallacy, one shared by many of the courts on which it relies: the conclusion that the meaning of policy language is to be discovered by citing one of the dictionary meanings of the key words, such as "irritant" or "discharge." (See *American States Ins. Co. v. Nethery* (5th Cir. 1996) 79 F.3d 473, 476; *Peace*, *supra*, 596 N.W.2d at p. 438; *Deni Assocs.*, *supra*, 711 So.2d at p. 1139.) Although examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the "ordinary and popular" sense of the word if it disregards the policy's context. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) Rather, a court properly refusing to make " 'a fortress out of the dictionary' " (*Russian Hill Improvement Assn. v. Board of Permit Appeals* (1967) 66 Cal.2d 34, 42 [56 Cal.Rptr. 672, 423 P.2d 824], quoting Justice Learned Hand's dictum in *Cabell v. Markham* (2d Cir. 1945) 148 F.2d 737, 739) must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language. (*AIU Ins. Co.*, *supra*, 51 Cal.3d at p. 822.)

The unreasonableness of Truck Insurance's interpretation becomes clear when its full implications are considered. Virtually any substance can act under the proper circumstances as an "irritant or contaminant." (See *City of Pittsburg, Kans., supra*, 768 F.Supp. at p. 1470.) The court in *Pipefitters, supra*, 976 F.2d at page 1043, stated: "Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results." The hypothetical allergic reaction to pool chlorine, proposed by the *Pipefitters* court, illustrates this absurdity. Chlorine certainly contains irritating properties that would cause the injury. Its dissemination throughout a pool may be literally described as a dispersal or discharge. Our research reveals no court or commentator that has concluded such an incident would be excluded under the pollution exclusion. The response of two leading insurance industry attorneys has simply been to state that "there are no decisions reporting denials arising from . . . swimming pool chlorine under the [pollution] [e]xclusion." (Shelley & Mason, *supra*, 33 Tort & Ins. L.J. at p. 772.) Truck Insurance's counsel took a similar position at oral argument.

Other such hypotheticals can be imagined. The application of iodine onto a cut through an eyedropper may be literally characterized as a discharge or release of an irritant. Truck Insurance's interpretation would therefore bar coverage for injury caused by the misapplication of iodine, or its application on someone who was hypersensitive or has an allergic reaction. A child's accidental ingestion of a pesticide or other toxic substance negligently left in an empty soft drink bottle would be barred. Yet few if any would think of these injuries as arising from "pollution" in any recognizable sense of that term.

Courts interpreting the pollution exclusion broadly have acknowledged that their interpretation may yield results that no one would consider reasonable. For example, the Florida Supreme Court, adopting a broad interpretation similar to Truck Insurance's, responded to various unspecified hypotheticals by affirming that "insurance policies will not be construed to reach an absurd result." (*Deni Assocs., supra*, 711 So.2d at p. 1140; see also *Peace, supra*, 596 N.W.2d at p. 442.) Yet interpreting an exclusionary clause so broadly that it logically leads to absurd results, in conjunction with an affirmation in the abstract that it will not be interpreted to yield such results, is a recipe for judicial confusion. (See Stempel, *supra*, 34 Tort & Ins. L.J. at p. 22.)

Our conclusion that Truck Insurance's interpretation is overly broad is bolstered by a closer examination of the connotations of the terms "discharge, dispersal, release or escape" in the context of the present case. "A 'release' is defined as 'the act of liberating or freeing: discharge from restraint.' "

(Webster's 3d New Internat. Dict. (2002) p. 1917.) An "escape" is defined as an "evasion of or deliverance from what confines, limits, or holds." (*Id.*, p. 774.) These terms connote some sort of freedom from containment, and it would be unusual to speak of the normal, intentional application of pesticides as a "release" or "escape" of pesticides.

To "disperse" is defined, variously, as "to cause to become spread *widely*," "to dissipate, dispel," "to spread or distribute from a fixed or constant source," or "to cause to break up and go in different ways." (Webster's 3d New Internat. Dict., *supra*, p. 653, italics added.) The notion of "dispersal" as a *substantial* dissemination is reinforced by its use with the term "pollutant." Indeed, the word "dispersal," when in conjunction with "pollutant," is commonly used to describe the spreading of pollution widely enough to cause its dissipation and dilution. (See, e.g., Milloy, *Northeast Blowing Smoke on Cause of Its Pollution*, Chicago Sun-Times (Dec. 16, 2002) p. 53 ["beyond 100 to 200 miles, air pollutants are dispersed"]; Sanchez, *In Calif., A Crackling Controversy over Smog*, Washington Post (Feb. 16, 2003) p. A1 ["the valley . . . is bordered on three sides by mountain ranges and cannot naturally disperse . . . the pollution it creates"].) Knowledge of common usage does not lead us to believe that the term "disperse pesticides" is generally used as a substitute for "spray" or "apply" pesticides, except perhaps when the pesticides are being spread throughout a large area. (See, e.g., Ritter, *Pesticide Trucks Go After Mosquitoes*, Chicago Sun-Times (Sept. 9, 2002) p. 4 [referring to "one teaspoon of the pesticide . . . sumiturin . . . dispersed over an area the size of a football field"]; Simmons, *Tanzania Begins to Deal with Toxic Wasteland*, L.A. Times (Mar. 30, 2000) [referring to "some cataclysmic meteorological event that would wash or disperse large quantities of . . . persistent pesticide[s] into the environment"].) ▆ In the present case, the application of pesticides in and around an apartment building does not plainly signify to the common understanding the "dispersal" of a pollutant. (See *Kellman, supra,* 197 F.3d at p. 1185 [strains the meaning of "discharge, dispersal, seepage, dispersal, release or escape" to apply it to localized toxic injury occurring in the vicinity of intended use]; see also *Lumbermens, supra,* 39 F.3d at p. 1336; *Center for Creative Studies, supra,* 871 F.Supp. at pp. 946–947; *Steely, supra,* 785 A.2d at p. 982.)

"Discharge" is defined most pertinently as "to send forth" or "to give outlet to: pour forth." (Webster's 3d New Internat. Dict., *supra*, p. 644.) Although the application of pesticides could literally be described as a "discharge" of pesticides, that term is rarely used in this manner. In fact, a LexisNexis Allnews[5] search of "pesticide" in the same sentence with "discharge" reveals

---

[5] This database consists of more than 8,600 English-language news sources, including newspapers, magazines, and wire services. (LexisNexis 2002 Directory of Online Services (2002) p. 278.)

that the two words are used together almost invariably to describe the runoff of pesticides into water or soil, often with other effluents. (See, e.g., McChesney, *Future of Farming in California's Central Valley*, All Things Considered (Nov. 12, 2002) [radio broadcast referring to "pesticide discharges to surface waters and other agricultural pollutants"]; Rogers, *Deal to Upgrade Mexican Sewage Treatment Is Set*, San Diego Union-Tribune (July 17, 2002) p. B-1 [referring to industrial plant that "discharges . . . effluent contain[ing] . . . pesticides . . . into the ocean"]; Kay, *Growers Sued over Pollution; Suit Says Pesticides Contaminated Water*, S.F. Chronicle (Feb. 22, 2002) p. A21 [referring to "discharg[ing] pesticide-laden irrigation runoff"]; Gold, *A Looming Ecological Mistake*, L.A. Times (Sept. 9, 2001) [referring to "discharge [of] harmful pesticides" into nearby creek].) In other words, the term "discharge" is commonly used with pesticides to describe pesticide runoff behaving as a traditional environmental pollutant rather than pesticides being normally applied.[6]

In short, because Truck Insurance's broad interpretation of the pollution exclusion leads to absurd results and ignores the familiar connotations of the words used in the exclusion, we do not believe it is the interpretation that the ordinary layperson would adopt. What then is the plain meaning of the pollution exclusion? The key to this inquiry, we believe, turns on the meaning of the term "pollutant." ■ Because the definitional phrase "any irritant or contaminant" is too broad to meaningfully define "pollutant," we must turn to the common connotative meaning of that term. This position was well articulated by the court in *Regional Bank of Colorado v. St. Paul Fire and Marine Ins. Co.* (10th Cir. 1994) 35 F.3d 494, interpreting Colorado law, when considering whether carbon monoxide fumes from a residential heater should be considered pollution: "A reasonable policy holder would not understand the policy to exclude coverage for *anything* that irritates. 'Irritant' is not to be read literally and in isolation, but must be construed in the context of how it is used in the policy, i.e., defining 'pollutant.' [¶] While a reasonable person of ordinary intelligence might well understand carbon monoxide is a pollutant when it is emitted in an industrial or environmental setting, an ordinary policyholder would not reasonably characterize carbon monoxide emitted from a residential heater which malfunctioned as 'pollution.' It seems far more reasonable that a policyholder would understand it as being limited to irritants and contaminants *commonly thought of as pollution*

---

[6] In fact, the Allnews search of "pesticide" within the same sentence as "discharge" for the last 10 years produced almost no evidence that the word "discharge" is used to describe the normal application of pesticides. Of 246 search results in which some form of "discharge" was used as a verb with "pesticide," only in two instances was "discharge" used to describe normal pesticide application, and then only in the context of a discussion of insurance or legal matters. (See Shaheen, *Be Practical When Purchasing Policies*, 68 Pest Control No. 11 (Nov. 1, 2000) p. 48; *Federal Court Refuses to Halt West Nile Virus Pesticide Program*, 12 Real Estate/Environmental Liability News, No. 3 (Oct. 27, 2000).)

and not as applying to every possible irritant or contaminant imaginable." (*Id.* at p. 498, 2d italics added; accord, *Stoney Run Co. v. Prudential-LMI Commercial Ins. Co.* (2d Cir. 1995) 47 F.3d 34, 38; *Gill, supra,* 686 N.E.2d at p. 999.)

Limiting the scope of the pollution exclusion to injuries arising from events commonly thought of as pollution, i.e., environmental pollution, also appears to be consistent with the choice of the terms "discharge, dispersal, release or escape." As one court has observed: "The drafters' utilization of environmental law terms of art ('discharge,' 'dispersal,' . . . 'release,' or 'escape' of pollutants) reflects the exclusion's historical objective—avoidance of liability for environmental catastrophes related to intentional industrial pollution." (*RSJ, Inc., supra,* 926 S.W.2d at p. 681; see also *Nautilus Ins. Co. v. Jabar, supra,* 188 F.3d at p. 30; *Center for Creative Studies, supra,* 871 F.Supp. at pp. 944–945; *Koloms, supra,* 687 N.E.2d at pp. 81–82.) It may be an overstatement to declare that "discharge, dispersal, release or escape," by themselves, are environmental law terms of art. But, as discussed above, these terms, used *in conjunction with* "pollutant," commonly refer to the sort of conventional environmental pollution at which the pollution exclusion was primarily targeted.

Moreover, as discussed above, there appears to be little dispute that the pollution exclusion was adopted to address the enormous potential liability resulting from antipollution laws enacted between 1966 and 1980. (*Koloms, supra,* 687 N.E.2d at pp. 79–81; see also Shelly & Mason, *supra,* 33 Tort & Ins. L.J. at pp. 753–755; Stempel, *supra,* 34 Tort & Ins. L.J. at pp. 33–40.) On the other hand, neither Truck Insurance nor the considerable number of amici curiae from the insurance industry writing on its behalf point to any evidence that the exclusion was directed at ordinary acts of negligence involving harmful substances. (See Stempel, *supra,* 34 Tort & Ins. L.J. at pp. 34–36 [pointing to the lack of evidence supporting the insurers' position despite their greater access to policy drafters' documents].) Nor do they bring to light evidence that the substantial limitation on CGL coverage that an exclusion so interpreted would impose was communicated to the purchasers of insurance or insurance regulators, nor that the significant reduction in coverage was accompanied by a reduction in premiums. (See *Fidelity & Dep. Co. of Maryland v. Charter Oak Fire Ins. Co.* (1998) 66 Cal.App.4th 1080, 1086 [78 Cal.Rptr.2d 429] [amount of premium paid may be relevant to extent of coverage]; MacDonald, *Decades of Deceit: The Insurance Industry Incursion into the Regulatory and Judicial Systems* (Nov./Dec. 1997) vol. 7, No. 6, Coverage 3, 8 [pointing out that the adoption of the current pollution exclusion was not accompanied by premium reductions].) The history and purpose of the clause, while not determinative, may properly be used by courts as an aid to discern the meaning of disputed policy language. (See

*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 670–671 [42 Cal.Rptr.2d 324, 913 P.2d 878].)

■ Finally, an interpretation limiting the exclusion to environmental pollution appears reasonable in light of the purpose of CGL policies—which "is 'to provide the insured with the broadest spectrum of protection against liability for unintentional and unexpected personal injury or property damage arising out of the conduct of the insured's business.' " (*City of Pittsburg, Kans., supra,* 768 F.Supp. at p. 1468, fn. 5, quoting Peters, *Insurance Coverage for Superfund Liability: A Plain Meaning Approach to the Pollution Exclusion Clause* (1987) 27 Washburn L.J. 161, 166.) On the other hand, Truck Insurance's interpretation would fundamentally undermine that purpose by cutting a broad and arbitrary swath through CGL protections, excluding virtually all injuries involving substances that cause harm. Neither the language nor the historical purpose of the pollution exclusion supports such a drastic contraction of CGL policy coverage.

To be sure, terms such as "commonly thought of as pollution," or "environmental pollution," are not paragons of precision, and further clarification may be required. But reference to these terms is sufficient to resolve the present case. ■ We conclude that it is far from clear MacKinnon's claim, based on the Denzin action, for injuries arising from the normal, though negligent, residential application of pesticides, would be commonly thought of as pollution. While pesticides may be pollutants under some circumstances, it is unlikely a reasonable policyholder would think of the act of spraying pesticides under these circumstances as an act of pollution. We agree with the observation of the court in *Tufco Flooring, supra,* 409 S.E.2d at page 698, that the "common understanding of the word 'pollute' indicates that it is something creating impurity, something objectionable and unwanted." The normal application of pesticides around an apartment building in order to kill yellow jackets would not comport with the common understanding of the word "pollute."

Amicus curiae London Market Insurers proposes an interpretation of the pollution exclusion that is somewhat less broad than that advocated by Truck Insurance but would encompass the claim in this case. This interpretation is essentially the one adopted by the Wisconsin Supreme Court in *Peace.* The *Peace* court sought to distinguish its holding that injury from the ingestion of lead paint chips is excluded, from its previous holding in *Donaldson, supra,* 564 N.W.2d 728, that injury from "sick building syndrome" caused by excessive accumulation of carbon dioxide, was not: "The [*Donaldson*] court contrasted exhaled carbon dioxide with the nonexhaustive list of pollutants in the pollution exclusion clause and observed that exhaled carbon dioxide is universally present and generally harmless in all but the most unusual

circumstances. [Citation.] The same cannot be said for lead paint chips, flakes, and dust. They are *widely, if not universally, understood to be dangerous* and capable of producing lead poisoning. The toxic effects of lead have been recognized for centuries. Reasonable owners of rental property understand their obligation to deal with the problem of lead paint." (*Peace, supra,* 596 N.W.2d at p. 443, italics added, fns. omitted.)

■ We doubt a layperson reading the exclusion would interpret it to apply to all injuries arising from substances "widely . . . understood to be dangerous." This interpretation has no basis in the language of the clause. On the other hand, the interpretation limiting the exclusion to what is "commonly thought of as pollution" is firmly rooted in the policy's language, based as it is on the recognition that the words "pollutant" and "pollution" have definite connotations. The latter interpretation is also in accord with the historical purpose of the pollution exclusion and the purpose of the CGL policy, discussed above.[7]

But even if London Market Insurers' interpretation is considered reasonable, it would still not prevail, for in order to do so it would have to establish that its interpretation is the *only* reasonable one. (See *Waller, supra,* 11 Cal.4th at p. 18.) "[W]e are not required, in deciding the case at bar, to select one 'correct' interpretation from the variety of suggested readings. To affirm the trial courts' decisions in favor of claimants, we need not determine that the two interpretations proposed by the insurer are not possible, or even reasonable, interpretations of the clause in question . . . . Instead, even assuming that the insurer's suggestions are reasonable interpretations which would bar recovery by the claimants, we must nonetheless affirm the trial courts' finding of coverage so long as there is any other reasonable interpretation under which recovery would be permitted in the instant cases." (*State Farm Mut. Auto Ins. Co. v. Jacober, supra,* 10 Cal.3d at pp. 202–203, fn. omitted.)

Thus, assuming arguendo that London Market Insurers' interpretation is reasonable, the interpretation of the pollution exclusion as limited to conventional environmental pollution is at least as reasonable. ■ We therefore cannot say that the exclusion plainly and clearly excludes the landlord's allegedly negligent use of pesticides in the present case, i.e., the exclusion

---

[7] Against the position that the exclusion applies only to environmental pollution, amicus curiae Complex Insurance Claims Litigation Association points to the elimination of the limitation that the pollution be discharged, etc., "into or upon land, the atmosphere or any watercourse or body of water" from the current pollution exclusion, and its replacement with "at or from the insured location" or a similar phrase. Of course, substantial environmental pollution may occur at or on an insured's property. (See, e.g., *Foster-Gardner, Inc. v. National Union Fire Ins.* Co. (1998) 18 Cal.4th 857, 861 [77 Cal.Rptr.2d 107, 959 P.2d 265].) The purpose of eliminating "into or upon land" is unclear and by no means unambiguously supports the insurer's position in the present case.

does not plainly and clearly take away what the CGL coverage provision patently confers. Accordingly, the exclusion must be interpreted in favor of coverage. (*State Farm Mut. Auto Ins. Co. v. Jacober, supra,* 10 Cal.3d at pp. 201–202.)

## III.  DISPOSITION

The judgment of the Court of Appeal affirming summary judgment on Truck Insurance's behalf is reversed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Respondent's petition for a rehearing was denied September 17, 2003, and the opinion was modified to read as printed above. Kennard, J. did not participate therein.