Filed 8/25/22  Butter Nails and Waxing v. Underwriters at Lloyd's London CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| BUTTER NAILS AND WAXING, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> UNDERWRITERS AT LLOYD'S, LONDON, <br><br> Defendant and Respondent. | B311455 <br><br> (Los Angeles County Super. Ct. No. 20STCV22288) |

APPEAL from orders of the Superior Court of Los Angeles County, William F. Fahey, Judge.  Reversed.

Law Office of Robert S. Gerstein and Robert S. Gerstein; Sigelman Law and Paul Sigelman; Law Office of Stanton Lee Phillips and Stanton Lee Phillips for Plaintiff and Appellant.

Soltman, Levitt, Flaherty & Wattles and John S. Levitt; Walker Wilcox Matousek, David E. Walker and Fred L. Alvarez for Defendant and Respondent.

_____

Plaintiff and appellant Butter Nails and Waxing, Inc. (plaintiff or Butter Nails) is a salon in Los Angeles. In March 2020, local governments issued public health orders requiring all but essential businesses to cease in-person activities in order to protect against the spread of the COVID-19 virus. Plaintiff filed a claim seeking compensation for business losses under an insurance policy issued by defendants and respondents Underwriters at Lloyd's, London (Underwriters). Underwriters denied the claim, and plaintiff filed suit. The trial court entered judgment against plaintiff after sustaining Underwriters' demurrer to plaintiff's first amended complaint and denying leave to amend.

On appeal, plaintiff contends the insurance policy's civil authority endorsement covered its business losses because the public health orders required evacuation of the business property. Underwriters contends the policy language does not provide coverage because the orders did not require evacuation. In addition, even if coverage exists under the civil authority endorsement, the parties take opposing positions on whether plaintiff's claim is barred by the policy's mold exclusion.

We conclude that Butter Nails has alleged facts sufficient to trigger coverage under the policy's civil authority endorsement, and that the mold exclusion does not apply to the circumstances of the claim presented by Butter Nails. We therefore reverse the judgment, and remand with directions to overrule Underwriters' demurrer.

# FACTUAL AND PROCEDURAL BACKGROUND[1]

## A. Public Health Orders

Responding to the potential spread of COVID-19 in March 2020, the City of Los Angeles (City) and the County of Los Angeles (County) each issued mandatory orders (the public health orders) directing members of the public to remain in their residences for all but essential activities and outdoor recreational activities. The City also ordered all businesses, other than essential businesses as defined in its public health order, "to cease operations that require in-person attendance by workers at a workplace" and "[to] remain closed to the public." Similarly, the County ordered "all businesses to cease in-person operations and close to the public", with the exception of specifically identified essential businesses.[2]

The public health orders contained provisions allowing for limited access to the physical premises of non-essential businesses so that the businesses could perform specified functions. The City's initial order on March 19, 2020 provided a 24-hour period for business owners and employees to gather belongings and to address administrative needs, but emphasized that workplaces would "remain closed to the public." The

---

[1] The factual background is taken from plaintiff's complaint and matters judicially noticed by the trial court.

[2] The parties acknowledge and do not dispute that Butter Nails is not an essential business and its operations were covered by the public health orders.

County's initial March 21, 2020 order required "immediate closure" of all non-essential retail businesses.

The County issued a revised order on April 10, 2020, still requiring non-essential businesses to remain closed to the public, but permitting some limited access for "Minimum Basic Operations," such as protecting inventory and facilities; ensuring security, safety, and sanitation; processing employee payroll and benefits; and, supporting remote work by employees from home. The County's order did not supersede stricter limitations imposed by local public entities. On May 8, 2020, the City revised its order to permit non-essential businesses to conduct specified minimum basic operations similar to the County, but again emphasizing that the businesses remain "locked to the public at all times" with posted signage stating "the business is closed to the public."

The City's order provided that failure to comply would constitute a misdemeanor, subject to fines and imprisonment, and encouraged enforcement by the Los Angeles Police Department and the City Attorney. A subsequent City order also authorized the Department of Water and Power to shut off utility services to businesses and properties that failed to comply with the order.

## B. Plaintiff's Claim and Underwriters' Denial of Coverage

After closing its operations in compliance with the public health orders, plaintiff submitted a claim to Underwriters for business income losses on April 21, 2020. On May 29, 2020, Underwriters denied plaintiff's claim. The May 29, 2020 denial letter set forth the reasons for Underwriters' denial of coverage,

4

including that the public health orders did not prohibit access to the business property or order it to be evacuated, and that coverage for losses due to a virus was precluded under an exclusion titled "Total Mold, Mildew or Other Fungi."

## C. Insurance Provisions at Issue

For purposes of this appeal, we are only examining the coverage forms, endorsements, and exclusions of the property portion of the Underwriters' insurance policy, not the commercial general liability (CGL) portion.[3] The two endorsements at issue are titled "Business Income for Off-Premises Utility Services and Civil Authority Action" (Civil Authority Endorsement) and "Exclusion – Total Mold, Mildew or Other Fungi" (Mold Exclusion).

### 1. Civil Authority Endorsement

The portion of the Civil Authority Endorsement insuring against losses related to government orders states, in relevant part, that Underwriters "will pay for loss of Business Income or Extra Expense at 'described premises' caused by interruption of business due to 'Civil Authority Action' that requires evacuation

---

[3] Plaintiff's first amended complaint alleged that plaintiff's CGL coverage included business income loss, but a review of the exhibits and the full policy demonstrates that coverage for business income and extra expenses was part of the property coverage.

of the 'described premises.'"[4]  "Civil Authority Action" is defined in the Civil Authority Endorsement as "a mandatory action from a government authority requiring evacuation from the 'described premises,'" which was plaintiff's business location.  The term "evacuation" is not defined in the Civil Authority Endorsement or elsewhere in the policy.

## 2. Mold Exclusion

The Mold Exclusion excludes property insurance and business loss insurance coverage for losses or costs "caused directly or indirectly by, arising out of, in connection with, resulting from, contributed to or related in any way by exposure to or the manifestation, . . . appearance, presence or growth of mold, mildew, mycotoxins, fungi or organic pathogens."  The endorsement defines "organic pathogens" as "any organic irritant or contaminant including but not limited to the following: mold,

---

[4] The Civil Authority Endorsement states that it modifies insurance provided under the Business Income (and Extra Expense) coverage form, which is one of the property coverages.  The Civil Authority Endorsement also addresses coverage for a seemingly unrelated topic: namely, interruption of water, communication, or power supply services to the insured business premises.  This provision states, in relevant part, that Underwriters "will pay for loss of Business Income or Extra Expense at 'described premises' caused by interruption of services to the 'described premises'.  The interruption must result from a Covered Cause of Loss OR wind, hail, flood or earth movement damage" to specified water, communication, or power supply infrastructure, as defined in the Civil Authority Endorsement.

6

fungus, bacteria, or virus including but not limited to their byproducts such as mycotoxins, mildew, or biogenic aerosol."[5]

---

[5] The complete endorsement language states "We do not cover loss, damage, cost, fine, penalty or expense caused directly or indirectly by, arising out of, in connection with, resulting from, contributed to or related in any way by exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or organic pathogens. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

"The term 'organic pathogen' or 'organic pathogens' means any organic irritant or contaminant including but not limited to the following: mold, fungus, bacteria, or virus including but not limited to their byproducts such as mycotoxins, mildew, or biogenic aerosol. 'Organic pathogen' includes but is not limited to the following fungi or mycotoxins produced by such fungi: Aspergillus, Penicillium, Stachybotrys chartarum, Trichodema, and Fusarium Memnoniella.

"This exclusion also applies to any claim arising out of allegations of acts or omissions by or on behalf of the insured in connection with exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or organic pathogens. There shall be no obligation to defend the insured against any claim or loss excluded by this endorsement regardless of whether the allegations forming the basis of the claim or loss are groundless, false, or fraudulent.

"This exclusion includes but is not limited to (l) any cost, expense or charge to test, monitor, cleanup, remediate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any way respond to or assess the effects of mold, mildew, mycotoxins, fungi or organic pathogen; or (2) any cost, expense or charge in connection with the actual or alleged discharge, dispersal, seepage, migration, release, escape, exposure to, manifestation,

7

## D. Complaint and Demurrer

Plaintiff filed a first amended complaint in October 2020, alleging causes of action for declaratory relief, breach of insurance contract, and bad faith insurance claims practice against Underwriters.[6]  Underwriters filed a demurrer arguing that plaintiff had failed to adequately allege it was entitled to coverage under the Civil Authority Endorsement and, in any event, plaintiff's claim was excluded from coverage under the Mold Exclusion.

In January 2021, the trial court sustained the demurrer without leave to amend, finding that plaintiff had not shown it was entitled to coverage for business losses, because there was no evacuation within the clear meaning of the policy and the public health orders.  The trial court did not reach the issue of the Mold Exclusion.

## DISCUSSION

## A. Standard of Review and Applicable Law

"'Because the function of a demurrer is to test the sufficiency of a pleading as a matter of law, we apply the de novo standard of review in an appeal following the sustaining of a demurrer without leave to amend.  [Citation.]  We assume the truth of the allegations in the complaint, but do not assume the

_____

appearance, presence, or growth of mold, mildew, mycotoxins, fungi or organic pathogens."

[6] Plaintiff filed its initial complaint in June 2020.

truth of contentions, deductions, or conclusions of law.' [Citation.] A judgment or order of the lower court is presumed to be correct, and the appellant has the burden of affirmatively showing error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)" (*United Talent Agency v. Vigilant Insurance Company* (2022) 77 Cal.App.5th 821, 829 (*United Talent*).)

"The principles governing the interpretation of insurance policies in California are well settled. 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [(*Bank of the West*)]; see Civ. Code, § 1636.) "If contractual language is clear and explicit, it governs." (*Bank of the West,* at p. 1264; see Civ. Code, § 1638.) If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect "'the objectively reasonable expectations of the insured.'" (*Bank of the West,* at p. 1265, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.) Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer. (*Bank of the West,* at p. 1264.)' (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 501.) The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection. [Citations.]" (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 (*Minkler*).)

"To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity,

9

basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer. The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies. [Citations.]" (*Minkler, supra,* 49 Cal.4th at p. 322.)

"The existence of a material ambiguity in the terms of an insurance policy may not, of course, be determined in the abstract, or in isolation. The policy must be examined as a whole, and in context, to determine whether an ambiguity exists. (*MacKinnon* [*v. Truck Ins. Exchange* (2003)] 31 Cal.4th 635, 648 [(*MacKinnon*)]; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.)" (*Minkler, supra,* 49 Cal.4th at p. 322.)

**B. Analysis**

The parties disagree whether the term "evacuation" in the Civil Authority Endorsement encompasses the public health orders requiring non-essential businesses to close and encouraging people to remain at home unless they are engaging in essential activity. Even if the policy terms cover the public health orders, the parties also disagree about whether the policy's Mold Exclusion nevertheless bars plaintiff's claim. We consider each issue separately.

1. <u>Coverage Under the Civil Authority Endorsement</u>

While the case law governing insurance contracts and COVID-19 is relatively new, it is already "widely established that

temporary loss of *use* of a property due to pandemic-related closure orders, without more, does not constitute direct physical loss or damage." (*United Talent, supra,* 77 Cal.App.5th at p. 831.) This "widely established" rule, however, has developed in the context of insureds seeking coverage under policy provisions requiring property loss or damage. Here, plaintiff does not seek coverage under any portion of the policy that requires any type of property loss or damage. Rather, plaintiff seeks coverage under the Civil Authority Endorsement, which states, with very little explanation or qualification: "[Underwriters] will pay for loss of Business Income or Extra Expense at 'described premises' caused by interruption of business due to 'Civil Authority Action' that requires evacuation of the 'described premises.'" The Civil Authority Endorsement defines "Civil Authority Action" as "a mandatory action from a government authority requiring evacuation from the 'described premises.'" Accordingly, we consider the meaning of the term "evacuation," and whether the March 2020 public health orders fall within the meaning of that term.[7]

The trial court here found that the public health orders did not fall within the plain meaning of the term "evacuation." We disagree. Considering the plain language at issue, and that language in the context of the policy as a whole, we conclude that the term "evacuation" is broad enough to encompass the public health orders that required Butter Nails—a non-essential

_____

[7] Our analysis is limited to the question presented on appeal, and we express no opinion on any other aspect of coverage under the Civil Authority Endorsement, including applicable coverage limits.

11

business providing a service that by its nature must be delivered in person—to close its doors in order to prevent the spread of a dangerous virus.

Relying on dictionary definitions of the verb "evacuate" that focus on removing contents or emptying, plaintiff contends that an evacuation is a process defined by its result: a place is left empty.[8]  According to plaintiff, because the public health orders emptied the business of employees and customers, the orders "evacuated" the business.  Underwriters contends different dictionary definitions are more relevant to the circumstances at issue here; it argues the meaning of "evacuate" requires the element of *removing* people from a danger presented at a specific location.[9]  Underwriters contends that the public health orders here—which do not use the word evacuate—did not remove people, as there was no specific event where employees and customers were at plaintiff's business property, and were ordered to leave the property.  Underwriters also claims that the later revised orders permitting owners and employees to perform some business functions at the salon defeat any claim that the premises was evacuated.

"Although examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it

---

[8] Plaintiff cites, among others, the first definition in Webster's Encyclopedic Unabridged Dictionary of the English Language (2001), stating: "to leave empty, vacate."

[9] Underwriters cites a portion of the on-line version of Merriam-Webster's dictionary, stating "to remove from a military zone or dangerous area."

12

disregards the policy's context.  (*Bank of the West[, supra,*] 2 Cal.4th [at p.] 1265.)  Rather, a court properly refusing to make "'a fortress out of the dictionary,'" (*Russian Hill Improvement Assn. v. Board of Permit Appeals* (1967) 66 Cal.2d 34, 42, quoting Justice Learned Hand's dictum in *Cabell v. Markham* (2d Cir.1945) 148 F.2d 737, 739) must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the . . . language.  (*AIU Ins. Co., supra,* 51 Cal.3d at p. 822.)"  (*MacKinnon, supra*, 31 Cal.4th at p. 649.)

In an effort to strengthen their respective positions with definitions that are more helpful to their arguments, both parties overlook the most relevant, sensible, and straightforward dictionary definition of the word "evacuation:"  "1.b : any organized withdrawal or removal (as of persons or things) from a place or area especially as a protective measure."[10]  (Merriam-Webster's Unabridged Dict. (2022) https://unabridged.merriam-webster.com/unabridged/Evacuation> [as of August 23, 2022], archived at <https://perma.cc/56HT-J7HR>.)  Contrary to the parties' arguments, the term as it is used in the policy is not tied solely to the process or the end result of the public health orders.  Evacuations commonly occur in anticipation of potentially dangerous conditions, and pursuant to governmental direction with which affected persons voluntarily comply to ensure safety.  An evacuation does not require authorities actively removing persons.  Nor is it sensible to interpret evacuations to apply only to persons present in the affected area at the time evacuation is

_____

[10] Underwriters ignores a very similar articulation of this definition in the very same Merriam-Webster's on-line dictionary that Underwriters cites: "to withdraw from a place in an organized way especially for protection."

13

ordered: persons outside of an affected area at the time an evacuation is ordered are not exempt and free to return. The public health orders here effected an organized withdrawal of persons from all places operating as non-essential businesses for the purpose of protecting all City and County inhabitants from the spread of COVID-19. Therefore, it is of little import that the orders used terms like "safer at home" or "cease in-person operations and close to the public" rather than the term "evacuation." The public health orders plainly applied to all non-essential businesses within the jurisdiction of the City and County, and were not limited to only such locations where persons were gathered at the moment the orders were issued: indeed, the orders specifically provided for law enforcement to enforce the evacuation from non-essential business premises for prospective non-compliance, including through misdemeanor criminal prosecution.

Considering the language of the Civil Authority Endorsement in the context of the overall policy supports our view that the term "evacuation" has a broader meaning, and that the public health orders effected an evacuation. The simplicity of the applicable coverage statement—Underwriters will pay for business income losses due to "mandatory action from a government authority requiring evacuation from the [business premises]"—stands in stark contrast to other coverage statements included within the policy, most of which include detailed qualifying language circumscribing available coverage. For example, in addition to providing coverage when a government authority requires an evacuation, the Civil Authority Endorsement also includes language providing coverage for business income losses stemming from water, power, and

14

communication service interruptions. But the circumstances of coverage in that portion of the Civil Authority Endorsement are carefully limited to circumstances where the interruption "result[s] from a Covered Cause of Loss or wind, hail, flood or earth movement damage to the following property not on 'described premises.'" No such qualifiers are included when the interruption of business is due to a "mandatory action from a government authority requiring evacuation."

Comparing the language of the Civil Authority Endorsement at issue here to a separate provision for "Civil Authority Coverage" (which is not the basis for Butter Nails's current claim) further undermines the narrow interpretation Underwriters advances. The Civil Authority Endorsement at issue here modifies the Business Income (and Extra Expense) coverage form, which includes, under the heading "A. Coverage" and "5. Additional Coverages," a section titled "Civil Authority Coverage". Under the Civil Authority Coverage—a provision distinct from the Civil Authority Endorsement—Underwriters would pay for business income loss and extra expenses "caused by action of civil authority that prohibits access to the described premises," but only when multiple requirements are met. Specifically, coverage exists only when (1) there is damage to property other than the insured's, (2) the damaged property is not more than one mile from the insured property, (3) access to the area is prohibited by the civil authority, and (4) the civil authority has acted in response to dangerous physical conditions or to enable unimpeded access to the damaged property. The Civil Authority Endorsement at issue here, in contrast, contains no requirement that any property must be damaged or contain dangerous physical conditions for coverage to apply. Rather, a

15

"mandatory action from a government authority requiring evacuation" is the only requirement for coverage.

Finally, to the extent that there is ambiguity in the policy as to whether the public health orders here fit within the definition of an evacuation, we are guided by our obligation to protect "'the objectively reasonable expectations of the insured'" and the rule that ambiguities relating to coverage are to be broadly construed in favor of protection and resolved against the insurer. (*Bank of the West, supra,* 2 Cal.4th at pp. 1264–1265; *Minkler, supra,* 49 Cal.4th at p. 322.) Here, the public health orders prohibited Butter Nails from providing in-person services to their customers, resulting in business losses. We conclude the public health orders required an evacuation of the premises, consistent with the policy language and the reasonable expectations of Butter Nails. Accordingly, the Civil Authority Endorsement provided plaintiff with coverage, subject to any applicable exclusions, as discussed next.

2. Mold Exclusion

Having determined that coverage exists under the Civil Authority Endorsement, the question remains whether the Mold Exclusion applies.[11]  "To be enforceable, any insurance provision

---

[11] Butter Nails protectively argues in its opening brief that a different exclusion (the "seepage" exclusion) also does not apply. However, Underwriters does not offer any argument on appeal as to the applicability of that exclusion and further concedes that its demurrer did not raise the seepage exclusion in the trial court. We decline to consider whether the seepage exclusion applies to Butter Nails's claim.

16

that takes away or limits coverage reasonably expected by an insured must be "'conspicuous, plain and clear.'" (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204.)" (*St. Mary & St. John Coptic Orthodox Church v. SBC Ins. Services, Inc.* (2020) 57 Cal.App.5th 817, 834.)  Whether an exclusion meets this requirement is a question of law.  (*Alterra Excess & Surplus Ins. Co. v. Snyder* (2015) 234 Cal.App.4th 1390, 1404; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2021) ¶ 4:491.)  We are guided by our obligation to protect "'the objectively reasonable expectations of the insured'" and the rule that ambiguities relating to coverage are to be broadly construed in favor of protection and resolved against the insurer.  (*Bank of the West, supra,* 2 Cal.4th at pp. 1264–1265; *Minkler, supra,* 49 Cal.4th at p. 322.)

"Language in an insurance policy is 'interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.' [Citation.]  'The proper question is whether the [provision or] word is ambiguous in the context of *this* policy and the circumstances of *this* case.  [Citation.]  "The provision will shift between clarity and ambiguity with changes in the event at hand."  [Citation.]'  (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 868.)  Ambiguity ""is resolved by interpreting the ambiguous provisions in the sense the [insurer] believed the [insured] understood them at the time of formation.  [Citation.]  If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist.  [Citation.]'  'This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the

17

insured.""" [Citation.] "Any ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations.'" (*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 763.)" (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470–471 (*E.M.M.I.*).)

Policy exclusions are strictly construed. (*E.M.M.I., supra,* 32 Cal. 4th at p. 471; *MacKinnon, supra,* 31 Cal.4th at p. 648.) "'[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again "any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." [Citation.] Thus, "the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." [Citation.] The exclusionary clause "must be *conspicuous, plain and clear*."' [Citation.] This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded." (*MacKinnon, supra*, at p. 648.)

Here, the language of the Mold Exclusion does not "conspicuously, plainly, and clearly" exclude losses stemming from public health orders addressing a viral pandemic, particularly where the insured does not allege that the virus was present on the business premises. Rather, the title and language of the Mold Exclusion is more reasonably understood to exclude coverage for losses stemming from the presence of mold, mildew, or organic pathogens on the business premises.

The title of the Mold Exclusion is "Exclusion – Total Mold, Mildew, or Other Fungi." The exclusion states that Underwriters will "not cover loss, damage, [etc.] caused directly or indirectly by,

18

arising out of, . . . or related in any way by exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or organic pathogens."  The next paragraph defines an "organic pathogen" as "any organic irritant or contaminant including but not limited to the following: mold, fungus, bacteria, or virus including but not limited to their byproducts such as mycotoxins, mildew, or biogenic aerosol."

Here, the inclusion of the term "virus" in the list of "organic pathogens" does not make the Mold Exclusion applicable to *every* claim stemming directly or indirectly from a virus.  Rather, an insured would reasonably understand the exclusion to apply only where the claimed losses were related in some way to the presence of the "organic pathogen" on the business premises. Although the scope of a virus exclusion was not discussed in *United Talent, supra,* 77 Cal.App.5th 821, and the court rejected the insured's argument that the virus caused physical damage, part of the opinion helps to illuminate how the language of the Mold Exclusion in the case we are considering would apply in situations where the virus was present on the insured premises. The complaint at issue in *United Talent* alleged that "the virus damages property by 'physically permeating' and 'binding to' the property, and 'aerosolized droplet nuclei . . . , like toxic fumes, make the premises unsafe.'  It alleged that the presence of the virus 'causes physical loss and physical damage by requiring remedial measures to reduce or eliminate the presence of SARS-CoV-2, including extensive cleaning and disinfecting; installing, modifying, or replacing air filtration systems; remodeling and reconfiguring physical spaces; and other measures.'" (*Id*. at 834–835.)  The *United Talent* opinion also includes a hypothetical

19

scenario discussed in *Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688, 704–705, where "''a business—which could have otherwise been operating—had to shut down because of the presence of the virus within the facility.  For example, a restaurant might need to close for a week if someone in its kitchen tested positive for COVID-19, requiring the entire facility to be thoroughly sanitized and remain empty for a period.''''''  (*United Talent, supra,* at p. 838.)

In *MacKinnon*, our Supreme Court determined that a pollution exclusion that defined pollution as including "any irritant or contaminant" did not exclude a claim based on the negligent spraying of pesticides at an apartment building.  The court reasoned that the insurance company's proposed literal reading of the express terms would make the meaning of the term pollution too broad to be meaningful.  (*MacKinnon, supra,* 31 Cal.4th at pp. 652–653.)  Instead, the court turned to "the common connotative meaning" of the term, which was reasonably "'limited to irritants and contaminants *commonly thought of as pollution* and not as applying to every possible irritant or contaminant imaginable.'"  (*Id.* at p. 652.)

In the present case, plaintiff's first amended complaint alleged the COVID-19 virus had not contaminated the property.  We agree with plaintiff that the Mold Exclusion is meant to exclude coverage for losses stemming from the presence of mold, mildew, or organic pathogens on the business premises, and not anything beyond that.  Just as the Supreme Court in *MacKinnon* limited the role of the words "irritant" and "contaminant," in finding the scope of the pollution exclusion to be limited, when we construe the meaning of the word "virus" in context of the reasonably understood scope of the Mold Exclusion, it does not

20

exclude threats posed by viruses responsible for communicable disease, when the insured has not claimed that the virus was even present on the business premises.

In the circumstances presented in the current case, because COVID-19 was not present at the insured business premises, the exclusion does not apply.

## DISPOSITION

The judgment and the order sustaining the demurrer filed by defendant and respondent Underwriters at Lloyd's, London is reversed. The trial court is directed to enter an order overruling the demurrer as to all causes of action alleged by plaintiff and appellant Butter Nails and Waxing, Inc.  Butter Nails and Waxing, Inc. is awarded its costs on appeal.


MOOR, J.


I concur:


RUBIN, P. J.

Butter Nails and Waxing, Inc. v. Underwriters at Lloyd's of London
B311455


BAKER, J., Concurring


I agree the judgment of dismissal should be reversed. I disagree, however, with the majority's understanding of the key term "evacuation" that is used in the insurance policy at issue.

The insurance policy endorsement for "Business Income for Off-Premises Utility Services and Civil Authority Action" (the Endorsement) provides coverage for loss of business income or extra expense caused by "interruption of business due to 'Civil Authority Action' that requires evacuation of the 'described premises.'" The Endorsement (redundantly) defines a Civil Authority Action as "a mandatory action from a government authority requiring evacuation from the 'described premises.'"

In my view, there was an evacuation of Butter Nails and Waxing, Inc.'s (Butter Nails's) premises only for the period of time when Los Angeles County and City of Los Angeles public health orders required Butter Nails to close and cease in-person operations—without exception for "Minimum Basic Operations" (which includes various things like maintaining business inventory, ensuring security, processing payroll and benefits, and facilitating remote work). This interpretation of "evacuation" is consistent with the common understanding of the term, namely,

the exclusion of all (non-public-safety) personnel from a given area because of some health or safety danger.

The majority's opinion does not precisely delineate its different understanding of the term evacuation. The clearest the opinion comes is a statement that any health officer order requiring Butter Nails to "close its doors" (to whom and for how long is left unspecified) is an evacuation. I believe that does not provide the parties and the trial court with adequate guidance on how this lawsuit should proceed. Further, insofar as the majority holds an evacuation occurs even when the basic business operations contemplated by the later health officer orders are underway, I believe that is not how "evacuation" is understood in its "'ordinary and popular sense.'"[1] (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.)

I do agree, however, with the majority's analysis of why the exclusion for "Total Mold, Mildew or Other Fungi" does not preclude insurance coverage. I would accordingly reverse and remand for further proceedings consistent with the views I have expressed.


BAKER, J.

---

[1] To the extent the majority goes even further and holds there is an evacuation anytime there is an organized withdrawal or removal of one or more persons from a place, that would appear to permit all manner of odd outcomes (e.g., insurance coverage for lost income if a patron of the business were arrested by the police—and, in the majority's view, "evacuated" from the premises).

2