Filed 10/2/23

# <u>CERTIFIED FOR PARTIAL PUBLICATION</u>\*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| JRK PROPERTY HOLDINGS, INC., | B321806 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCV19983) |
| v. | |
| COLONY INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from an order of dismissal of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Affirmed in part, reversed in part, and remanded.

Spertus, Landes & Umhofer, Kevin J. Minnick; Cohen Ziffer Frenchman & McKenna, Robin Cohen, Meredith Elkins and Orrie A. Levy, for Plaintiff and Appellant.

---

\*       Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part D of the Discussion.

Clyde & Co. US, Susan Koehler Sullivan, Douglas J. Collodel and Brett C. Safford for Defendants and Respondents Endurance American Specialty Insurance Company and Maxum Indemnity Company.

Duane Morris, Max H. Stern, Jessica E. La Londe and Holden Benon for Defendants and Respondents Ironshore Specialty Insurance Company, Ategrity Specialty Insurance Company, RSUI Indemnity Company and Certain Underwriters at Lloyd's, London Subscribing to Policy No. (UMR) B0180PG1903066, and Certain Underwriters at Lloyd's, London Subscribing to Policy No. (UMR) B0180PG1902622.

Cummins & White, Larry M. Arnold, Margaret R. Miglietta, Noura K. Rizzuto; Stewart Smith and William F. Stewart for Defendant and Respondent Colony Insurance Company.

Kennedys CMK and Susan Frances Dent for Defendant and Respondent Crum & Forster Specialty Insurance Company.

Phelps Dunbar, Jay R. Sever; Selman Leichenger, Edson, Hsu, Newman & Moore and Meka Moore for Defendant and Respondent Scottsdale Insurance Company.

Dickinson Wright and Bennett Evan Cooper for Defendant and Respondent Evanston Insurance Company.

Akerman and Michael R. Weiss for Defendants and Respondents Homeland Insurance Company of New York and Hallmark Specialty Insurance Company.

Faegre Drinker Biddle & Reath, Kristopher S. Davis; Rinker Danzig Scherer Hyland & Perretti, Brian E. O'Donnell and Maura C. Smith for Defendant and Respondent Mitsui Sumitomo Insurance Company of America.

JRK Property Holdings, Inc. appeals from the order of dismissal with prejudice entered after the trial court granted without leave to amend the motion for judgment on the pleadings filed by primary insurer Ironshore Specialty Insurance Company (Ironshore) and excess insurers RSUI Indemnity Company (RSUI), Evanston Insurance Company (Evanston), and others (collectively, Insurers).[1]  JRK sued Insurers for breach of contract and declaratory judgment after Insurers denied coverage for JRK's lost business income that resulted from its restricted operations and diminished rental revenue due to the COVID-19[2] pandemic and associated government orders.

On appeal, we again address whether the alleged presence of the COVID-19 virus on an insured's properties constitutes

---

[1]     Insurers also include excess insurers Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B0180PG1903066, Certain Underwriters at Lloyd's, London subscribing to Policy No. (UMR) B0180PG1902622, Ategrity Specialty Insurance Company, Colony Insurance Company, Crum & Forster Specialty Insurance Company, Endurance American Specialty Insurance Company, Hallmark Specialty Insurance Company, Homeland Insurance Company of New York, Maxum Indemnity Company, Mitsui Sumitomo Insurance Company of America, and Scottsdale Insurance Company.  The motion was also brought on behalf of other primary insurers, but the trial court denied the motion as to those insurers because their policies provided coverage for interruption by communicable disease.  Those insurers are not parties to this appeal.

[2]     For ease of reference, we refer to the SARS-CoV-2 virus, its variants, and the coronavirus disease caused by them as COVID-19.

"direct physical loss or damage" to the insured properties, providing coverage under the insurance policies at issue. In the unpublished portion of the opinion, we conclude JRK adequately alleged for purposes of Insurers' motion for judgment on the pleadings that contamination from the COVID-19 virus physically altered the premises of its properties.

In the published part of this opinion, we address Insurers' argument in the alternative that coverage was barred by a pollution exclusion that applied to pollution caused by, among other things, the release, discharge, or dispersal of pollutants or contaminants, where the terms "pollutants or contaminants" are defined to include a contaminant that can cause or threaten harm to human health or damage to property, including a "bacteria, virus, or hazardous substances" listed under specified environmental laws. The Supreme Court in *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 639-640 (*MacKinnon*) held that the historical background of the pollution exclusion shows its inclusion in insurance policies was intended to address only traditional sources of environmental pollution. We reject Insurers' argument that inclusion of the term "virus" in the definition of a contaminant transforms an exclusion that applies to "pollution" (and typically environmental pollution) into one that encompasses the spread of a virus due to the normal human activities of breathing and touching surfaces.

JRK also challenges the trial court's holding with respect to RSUI and Evanston that their policies' pathogen exclusions bar coverage. We conclude in the published portion of the opinion that the RSUI pathogen exclusion applies because it bars coverage for "losses or damage" caused by the discharge or dispersal of a "pathogenic" material. Clearly the COVID-19 virus

4

is a pathogen. Although the exclusion uses the traditional discharge terms of art addressed in *MacKinnon*, the exclusion contains no reference to pollution. And the Evanston pathogen exclusion specifically bars loss or damage caused by the spread of an organic pathogen, defined to include a virus.

We reverse as to all Insurers except Evanston and RSUI.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *JRK's Business and Insurance Policies*

As alleged in the complaint, JRK was a real estate investment firm with investments in approximately 100 hotel and residential properties across 22 states at the time the COVID-19 pandemic took hold. JRK had $250 million in business interruption property insurance coverage it purchased "in a layered program" from Insurers, with each insurer providing a specified share of the total coverage. The insurance policies (Policies) provided substantially identical coverage incorporating or following a "master property policy" (with limited exceptions discussed below). The Policies were in effect from June 1, 2019 to June 1, 2020.

The Policies provided business interruption coverage for "loss resulting from necessary interruption of business conducted by the Insured and caused by direct physical loss, damage, or destruction by any of the perils covered herein." However, the Policies included a pollution exclusion for "[p]ollution caused directly or indirectly by the release, discharge, dispersal, seepage,

5

migration, or escape of pollutants or contaminants."[3]  "Pollutants or contaminants" were defined as any "solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water, Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U.S. Environmental Protection Agency."

Two of the Policies included insurer-specific exclusions precluding coverage for pathogenic materials or pathogens (pathogen exclusions).  The RSUI policy excluded "loss or damage caused directly or indirectly by the discharge, dispersal, seepage, migration, release, escape or application of any pathogenic or poisonous biological or chemical materials."  The RSUI exclusion did not define the term "pathogenic."

The Evanston policy excluded loss or damage directly or indirectly caused by the "[p]resence, growth, proliferation, spread or any activity of 'organic pathogens.'"  It defined an "organic pathogen" to include "[a]ny organic irritant or contaminant, including, but not limited to, 'fungus', . . . bacteria, virus, or other microorganisms of any type" and "[a]ny disease-causing agent as classified by the Environmental Protection Agency."  The

---

[3]    We have omitted capitalization and boldface when quoting from the insurance policies.

6

Evanston pathogen exclusion applied regardless of whether there was direct physical loss or damage to covered property or loss of use, occupancy or functionality or decreased valuation of covered property, or loss of business income.  Further, the pathogen exclusion replaced any policy exclusion for "'fungus', wet rot, dry rot and bacteria."

B.    *The Complaint*

JRK filed this action on May 27, 2021 alleging causes of action for breach of contract and declaratory relief premised on Insurers' refusal to cover JRK's losses and reservation of rights, in which Insurers stated they did not have sufficient information to provide coverage.

As alleged, the outbreak of the COVID-19 pandemic in early 2020 had an acute impact on JRK's business.  Because the virus could spread by airborne droplets and smaller aerosols that linger in the air, creating "fomites" on surfaces "physically affected by the coronavirus," the highly contagious virus caused loss and damage to JRK's large residential properties, hotels, and commercial establishments.  Specifically, "[t]he virus hangs in the air and attaches to property for extended periods of time.  Studies have shown that fomites—physical surfaces that promote infection—can become infectious on a whole range of surfaces, including stainless steel, wood, paper, plastic, glass, ceramic, cardboard, and cloth, many of which are used throughout JRK's properties."  The virus could survive for days on surfaces, compromising the "physical integrity of the structures it permeates" and posing an "imminent risk of physical damage to all other structures."  Thus, "[b]etween contagious surfaces and invisible particles suspended in the air, the coronavirus turned

7

JRK's properties into a gauntlet of deadly particles."  Moreover, because the virus was resilient, simple cleaning was not sufficient to sterilize the properties, and no amount of cleaning could remove the aerosolized virus particles, which had the potential to generate new infectious fomites.

In response to the outbreak of COVID-19, state and local governments imposed "sweeping restrictions on residents' daily lives and property to protect them."  Each of the states in which JRK owned property imposed some form of lockdown order restricting travel, directing residents to remain at home, and closing non-essential businesses.  These orders had "wide-reaching impacts, including reduced travel and loss of jobs, resulting in tenants failing to pay market rents."

Residents at JRK's properties tested positive for COVID-19 as early as mid-March 2020; in total, its properties had at least 178 confirmed cases, including tenants and employees.  At least 60 of JRK's residential properties had at least one confirmed positive test from a resident, and JRK alleged it was "statistically certain" the virus was present at all of its properties at some point since the pandemic began.  In addition, JRK's residential properties were "uniquely vulnerable to the physical loss or damage the virus causes, as its apartment properties face[d] increased exposure when tenants [were] ordered to 'stay home,' yet the public areas such as lobbies and elevators [were] required to be open for safety and building use."

Accordingly, the pandemic caused JRK to suffer significant financial losses, including substantial costs incurred to respond to on-site cases.  The lockdown orders also "devastated JRK's business" by prohibiting residential evictions, deferring rental payments, and closing popular tourist destinations, bars,

8

restaurants, and venues that provided the draw for travelers to stay at JRK's hotels.

JRK provided prompt notice of its claim to Insurers in March 2020.  Insurers responded through their adjuster on July 6, 2020 with a reservation of rights indicating they lacked sufficient information to determine "'whether or not there may be coverage under the Policies'" but failing to request any specific information.

JRK provided a second notice on August 17, 2020 to its higher-level excess carriers.  On October 5, 2020 the adjuster responded with a "supplemental reservation of rights letter that was materially similar to the July 6 [l]etter."  On March 29, 2021, after JRK provided requested information, Insurers again reserved their rights and "effectively denied coverage."

C.    *Insurers' Motion for Judgment on the Pleadings*

On January 21, 2022 Insurers filed a motion for judgment on the pleadings, arguing JRK failed to allege facts showing a distinct "'physical alteration'" to its covered property as required to establish "'direct physical loss or damage'" under California law, making only conclusory assertions.  Further, temporary loss of use did not constitute "'direct physical loss or damage.'"  Insurers argued *Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688 (*Inns-by-the-Sea*) and the federal appellate courts were unanimous in rejecting insurance coverage for economic losses arising from the COVID-19 pandemic.  Insurers also argued specific exclusions precluded coverage, including the pollution exclusion in all of the policies, and the pathogen exclusions in two of the policies.  Finally, Insurers urged the trial court to deny leave to amend because no amount

9

of "artful pleading" could remedy the legal deficiencies in the complaint.

In its opposition JRK argued it sufficiently alleged "'direct physical loss or damage'" by pleading the actual presence of COVID-19 on the insured properties, which altered the air and surfaces of the properties and rendered the properties functionally useless. JRK distinguished *Inns-by-the-Sea* on the basis the alleged loss there resulted from the government orders, not physical loss or damage from the virus. JRK asserted the pollution exclusion did not apply because it was limited to traditional environmental pollution, and the pathogen exclusions likewise did not apply. JRK requested leave to amend if its allegations were inadequate.

After a hearing, on April 18, 2022 the trial court granted the motion without leave to amend as to primary insurer Ironshore and the excess insurers. In granting the motion, the court concluded JRK suspended its operations as a result of the government orders, not the presence of the virus on its properties. The court also found the pollution and pathogen exclusions barred coverage. The court denied the motion with respect to the primary insurers other than Ironshore (not parties on appeal), finding a triable issue of fact as to whether a communicable disease provision applicable only to those insurers barred coverage.[4] The communicable disease provision did not

_____

[4]    The communicable disease provision provided coverage for "the actual loss sustained and extra expense incurred by the insured during the period of liability if access to a location owned, leased or rented by the insured is limited, restricted or prohibited as a result of  [¶]  a) [a]n order of an authorized governmental agency regulating the actual not suspected presence of

10

apply to the excess insurers because the provision was subject to a $2.5 million cap, and the excess insurers' policies attached above that level.

On May 10, 2022 the court entered an order of dismissal in favor of Insurers and awarded costs in an amount to be determined. JRK timely appealed.

## DISCUSSION

A.    *Standard of Review*

"'A judgment on the pleadings in favor of the defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action. [Citation.] A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review.'" (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777; accord, *Starlight Cinemas, Inc. v. Massachusetts Bay Ins. Co.* (2023) 91 Cal.App.5th 24, 31 (*Starlight*).) "'"We treat the pleadings as admitting all of the material facts properly pleaded, but not any contentions, deductions or conclusions of fact or law contained therein."'" (*Tarin v. Lind* (2020) 47 Cal.App.5th 395, 403-404; accord, *Starlight*, at p. 31.) "'If a judgment on the pleadings is correct on any theory of law applicable to the case, we will affirm it regardless of the considerations used by the superior court to reach its conclusion.'" (*Environmental Health Advocates, Inc. v.*

---

communicable disease; or  [¶]  b) [a] decision of an officer of the insured as a result of the actual not suspected presence of communicable disease." The Ironshore policy included a provision stating coverage for [c]ommunicable [d]isease is [e]xcluded."

11

*Sream, Inc.* (2022) 83 Cal.App.5th 721, 729; accord, *Starlight*, at p. 31.)

"'Denial of leave to amend after granting a motion for judgment on the pleadings is reviewed for abuse of discretion.'" (*Environmental Health Advocates, Inc. v. Sream, Inc., supra*, 83 Cal.App.5th at p. 729; accord, *Starlight, supra*, 91 Cal.App.5th at p. 31.) An abuse of discretion occurs if "'there is a reasonable possibility that the defect can be cured by amendment.'" (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100 [reviewing an order sustaining demurrer without leave to amend]; accord, *Starlight*, at p. 32.) "'The plaintiff has the burden of proving that [an] amendment would cure the legal defect, and may [even] meet this burden [for the first time] on appeal.'" (*Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority* (2018) 19 Cal.App.5th 1127, 1132; accord, *Ko v. Maxim Healthcare Services, Inc.* (2020) 58 Cal.App.5th 1144, 1150; see *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 971.)

B.    *Interpretation of Insurance Contracts*

"In general, interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation." (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 194; accord, *Shusha, Inc. v. Century-National Ins. Co.* (2022) 87 Cal.App.5th 250, 259, review granted February 28, 2023, S278614 (*Shusha*).) "'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If contractual language is clear and explicit, it governs." [Citations.] If the terms are ambiguous [i.e., susceptible of more than one reasonable

12

interpretation], we interpret them to protect "'the objectively reasonable expectations of the insured.'" [Citations.] Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer." (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321; accord, *Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215, 230; *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.* (2022) 81 Cal.App.5th 96, 105 (*Marina Pacific*).)

"The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection." (*Minkler v. Safeco Ins. Co. of America, supra*, 49 Cal.4th at p. 321; accord, *Marina Pacific, supra*, 81 Cal.App.5th at p. 106.) "[I]n cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer. The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies." (*Minkler*, at p. 322; accord, *Montrose Chemical Corp. of California v. Superior Court, supra*, 9 Cal.5th at p. 230; *Marina Pacific*, at p. 106.)

C.     *Coverage for COVID-19 Pandemic-related Losses*

At the time the trial court sustained the motion for judgment on the pleadings, only one California appellate court (*Inns-by-the-Sea, supra*, 71 Cal.App.5th 688) had examined whether business losses caused by the COVID-19 pandemic were covered by commercial property insurance. There, a hotel

13

operator sued its insurer over the denial of a claim for loss of business income, alleging it ceased operations at its properties due to county health orders. (*Id.* at p. 693.) Division One of the Fourth Appellate District affirmed the trial court's order sustaining the insurer's demurrer without leave to amend. The court concluded hotel operations were not suspended due to "'direct physical loss of or damage to'" the hotels because the hotel operator did not allege a physical alteration of the hotel premises, but rather, it alleged economic loss caused by the government closure orders. (*Id.* at pp. 705-706.) The court rejected the contention "'a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property'" would be sufficient for coverage. (*Ibid*., italics omitted, quoting 10A Couch on Insurance (3d ed. 2016) § 148:46, pp. 148-96 to 148-98; see *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766, 779-80 (*MRI Healthcare*) [failure of an MRI machine to function after it was "'ramped down'" was not a covered loss because "there was no 'distinct, demonstrable [or] physical alteration'"].)

This court first considered a coverage dispute arising from the COVID-19 pandemic in *Marina Pacific, supra*, 81 Cal.App.5th 96. There, a hotel operator alleged the presence of the COVID-19 virus caused physical damage to its insured property. (*Id.* at p. 110.) Reversing the trial court's order sustaining the insurer's demurrer without leave to amend, we assumed the policy term "'direct physical loss or damage'" meant there must be an external force acting on the property, causing a "distinct, demonstrable, physical alteration" as stated in *MRI Healthcare, supra*, 187 Cal.App.4th 766, 778-779. (*Marina Pacific*, at pp. 107-108.) We concluded the hotel's complaint

14

adequately alleged physical alteration, explaining, "Assuming, as we must, the truth of those allegations, even if improbable, absent judicially noticed facts irrefutably contradicting them, the insureds have unquestionably pleaded direct physical loss or damage to covered property within the definition articulated in *MRI Healthcare*." (*Id*. at p. 109.) This court reached a similar conclusion in *Shusha, supra*, 87 Cal.App.5th at page 266, review granted, holding a restaurant's allegations that it suspended operations due to both physical alteration of its premises by the presence of the COVID-19 virus and government closure orders were sufficient to survive a demurrer. (See *John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2022) 86 Cal.App.5th 1195, 1201 [on demurrer, policy definition of "'loss or damage'" was broad enough to include "pervasive infiltration of virus particulates on the surfaces of covered property," which insured restaurant had alleged], review granted March 29, 2023, S278481.)

We recognize most California appellate courts have found allegations that losses resulted from the presence of the COVID-19 virus on covered property were insufficient to provide coverage for direct physical loss or damage to property. (See *Apple Annie, LLC v. Oregon Mutual Ins. Co.* (2022) 82 Cal.App.5th 919, 934 [rejecting insured's contention that no physical alteration was necessary]; *United Talent Agency v. Vigilant Ins. Co.* (2022) 77 Cal.App.5th 821, 838 [the "presence or potential presence of the virus does not constitute direct physical damage or loss"]; *Musso & Frank Grill Co., Inc. v. Mitsui Sumitomo Ins. USA Inc.* (2022) 77 Cal.App.5th 753, 761 [no "direct physical loss of or damage" to a restaurant as a result of the COVID-19 pandemic and related government orders]; see also *Tarrar Enterprises, Inc.*

15

*v. Associated Indemnity Corp.* (2022) 83 Cal.App.5th 685, 687-689 [adopting reasoning of *Apple Annie* but finding leave to amend should have been granted].)

The Supreme Court will address this split of authority in *John's Grill, Inc. v. The Hartford Financial Services Group, Inc., supra,* 86 Cal.App.5th 1195, review granted, and *Shusha, supra,* 87 Cal.App.5th at page 266, review granted. In addition, the Supreme Court has granted a request for certification by the Ninth Circuit on the following question of California law: "Can the actual or potential presence of the COVID-19 virus on an insured's premises constitute 'direct physical loss or damage to property' for purposes of coverage under a commercial property insurance policy?" (*Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (9th Cir. 2022) 56 F.4th 730, request for certification granted Mar. 1, 2023, S277893.)[5]

---

[5] The Supreme Court also granted the Ninth Circuit's request for certification in *French Laundry Partners, LP v. Hartford Fire Ins. Co.* (9th Cir. 2023) 58 F.4th 1305, 1307, request for certification granted Mar. 29, 2023, S278492 on the question of California law: "Is the virus exclusion in [the restaurant's] insurance policy unenforceable because enforcing it would render illusory a limited virus coverage provision allowing for the possibility of coverage for business losses and extra expenses allegedly caused by the presence and impacts of COVID-19 at an insured's properties, including the loss of business due to a civil authority closure order?" We decline JRK's request to hold our decision in this case pending guidance from the Supreme Court.

16

D. *JRK Adequately Stated Causes of Action for Breach of Contract and Declaratory Judgment*

We agree with JRK that the complaint adequately alleges loss resulting from physical alteration of the insured property to support its causes of action for breach of contract and declaratory relief. "'[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.'" (*Marina Pacific, supra*, 81 Cal.App.5th at p. 108; accord, *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) The Insurers' motion challenged only the third element, contending they did not breach their obligation to pay benefits under the Policies because JRK failed to allege direct physical damage or loss to its properties within the meaning of the policy.[6]

The parties' coverage dispute is a proper basis for a cause of action for declaratory relief. (See Code Civ. Proc., § 1060 [authorizing any person to bring "an original action . . . for a

---

[6] Because we conclude JRK adequately alleged loss of business income caused by direct physical loss of or damage to its properties, we do not reach whether JRK adequately alleged entitlement to coverage under the provisions for interruption by civil authority, ingress/egress, or interruption by communicable disease. We deny JRK's request to take judicial notice of four amicus curiae briefs filed by state medical organizations in other cases addressing whether the COVID-19 virus damages property, which are not relevant to this appeal from an order granting a motion for judgment on the pleadings, and we do not consider the portion of JRK's opening brief discussing the briefs. We deny Insurers' motion to strike the discussion of the amicus briefs in JRK's brief.

17

declaration of his or her rights and duties" "under a contract"]; *Lee v. Silveira* (2016) 6 Cal.App.5th 527, 546 [identifying "two essential elements" for declaratory relief: "'(1) a proper subject . . . , and (2) an actual controversy involving justiciable questions relating to the rights or obligations of a party'"].)

The allegations in JRK's complaint fall squarely within the type of allegations we found sufficient to allege coverage in *Marina Pacific* and *Shusha*. In *Marina Pacific*, the insureds alleged that "COVID-19 . . . not only lives on surfaces but also bonds to surfaces through physiochemical reactions involving cells and surface proteins, which transform the physical condition of the property." (*Marina Pacific, supra*, 81 Cal.App.5th at p. 108; see *Shusha, supra*, 87 Cal.App.5th at p. 264 [noting allegations "the virus 'can remain on smooth surfaces for at least 28 days,' and it 'adheres to, attaches to and alters the surfaces of the property and surfaces' it comes into contact with, creating 'fomites,' which are 'objects, previously safe to touch, that now serve as agents and mechanism for transmission of deadly, infections viruses and diseases'"], review granted.)

JRK similarly alleged the COVID-19 virus "hangs in the air and attaches to property for extended periods of time. Studies have shown that fomites—physical surfaces that promote infection—can become infectious on a whole range of surfaces, including stainless steel, wood, paper, plastic, glass, ceramic, cardboard, and cloth, many of which are used throughout JRK's properties . . . . [¶] [¶] . . . The virus thus compromises the physical integrity of the structures it permeates . . . ." Further, "[g]iven the ubiquity and pervasiveness of the coronavirus, no amount of cleaning or ventilation intervention will prevent an infected and contagious person—even one who is pre-

18

symptomatic or asymptomatic—from entering an indoor space and exhaling millions of viral particles into the air, which: (a) fills the air with aerosolized coronavirus that can be inhaled, sometimes with deadly consequences; and (b) *deposits coronavirus particles on the surfaces, physically altering and transforming them into disease-transmitting fomites.*" (Italics added.) JRK therefore had to take significant measures "far beyond ordinary or routine cleaning or improved ventilation" to "repair the properties from their unsafe, hazardous, and potentially deadly condition."

Finally, the insureds in *Marina Pacific* alleged that as a direct result of the presence of the virus, "the insureds were required to close or suspend operations in whole or in part at various times and incurred extra expense as they adopted measures to restore and remediate the air and surfaces at the insured properties." (*Marina Pacific, supra*, 81 Cal.App.5th at pp. 108-109; see *Shusha, supra*, 87 Cal.App.5th at p. 264 ["La Cava lost business revenues and incurred substantial costs to mitigate the damage by reconfiguring its property and increasing its sanitization procedures."], review granted.) Similarly, JRK alleged "the ubiquitous presence of COVID-19 and the coronavirus, including in infected guests, customers, employees and residents at JRK's insured properties, has interrupted that business model by causing physical loss and/or damage to the insured properties and rendering them unusable for their intended purpose." Further, JRK "incurred substantial costs and financial losses directly responding to documented onsite cases," including costs related to converting "physical leasing offices into virtual leasing systems," closing "various common spaces," and

19

expending "substantial sums of money to disinfect contaminated spaces after documented cases."

Insurers contend JRK's allegations are insufficient to state a claim because the complaint failed to allege the destruction or disposal of property, citing our observation in *Marina Pacific* that the "insureds specifically alleged they were required to 'dispose of property damaged by COVID-19 and limit operations at the Insured Properties.'" (*Marina Pacific, supra*, 81 Cal.App.5th at p. 109.) However, we found sufficient in *Shusha* the allegations that the restaurant incurred costs and lost revenue to mitigate the damage from the COVID-19 virus by reconfiguring its property and increasing its sanitization procedures, without alleging it needed to dispose of contaminated property. (See *Shusha, supra*, 87 Cal.App.5th at pp. 264-265, review granted.) As discussed, JRK similarly alleged it had to reconfigure its physical leasing offices and close common spaces in response to COVID-19 infections at its properties. And further, "JRK has undertaken many of these heightened measures in its insured properties in an attempt to repair the properties from their unsafe, hazardous, and potentially deadly condition, but no amount of diligence can actually prevent coronavirus from causing physical loss or damage to surfaces and air within insured properties."

Insurers also argue JRK's allegations of damage are conclusory. However, we rejected similar contentions in *Marina Pacific* and *Shusha*. As we explained in *Shusha, supra*, 87 Cal.App.5th at page 265, review granted, "[T]he insured is not required to provide authority at the pleading stage to support its position that contamination with the COVID-19 virus caused damage to the surfaces in its premises." (See *id*. at p. 266 ["it is a

20

question of fact for a summary judgment motion or trial whether the restaurant closure and modifications resulted from damage caused by the COVID-19 virus or the government orders"]; accord, *Marina Pacific, supra*, 81 Cal.App.5th at p. 109.) JRK's allegations are likewise sufficient to establish direct physical damage or loss under the Policies.[7]

E.      *The Exclusions from Coverage*

1.      *The pollution exclusion does not bar coverage*

Insurers contend the Policies' pollution exclusion bars coverage for JRK's losses because it covers the dispersal and migration of pollutants and contaminants, which terms are specifically defined to include a virus. We agree with JRK that the pollution exclusion does not apply here because a reasonable interpretation of the exclusion is that it applies only to traditional sources of environmental pollution, as the Supreme Court held in *MacKinnon, supra*, 31 Cal.4th at pages 639 to 640.

In *MacKinnon*, the Supreme Court addressed whether a standard pollution exclusion clause in a comprehensive general liability (CGL) insurance policy applied to a landlord's allegedly negligent spraying of pesticides that caused the death of a tenant. The policy exclusion barred coverage for bodily injury or property damage resulting from the "'actual, alleged, or threatened discharge, dispersal, release or escape of pollutants: (a) at or from the insured location.'" (*MacKinnon, supra*, 31 Cal.4th at p. 639.)

---

[7]      Because we find sufficient allegations of direct physical loss or damage to insured property, we do not reach whether the Policies covered JRK's alleged residential rental income loss and loss resulting from reduced hotel occupancy as a result of the government orders.

21

The policy defined "'Pollution or Pollutants'" as "'mean[ing] any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste materials.'" (*Ibid*.) Reversing the Court of Appeal's affirmance of summary judgment in favor of the insurer, the Supreme Court held the pollution exclusion did not "clearly exclude ordinary acts of negligence involving toxic chemicals such as pesticides." (*Ibid*.)

In reaching its decision, the *MacKinnon* court reviewed the historical background of the pollution exclusion, observing the exclusion was incorporated into insurance policies in response to the expansion of federal environmental laws, including the Clean Air Act (42 U.S.C. § 7401 et seq.), and later, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA; 42 U.S.C. § 9601 et seq.), which required increased environmental remediation and placed greater economic burdens on insurance underwriters. (*MacKinnon, supra*, 31 Cal.4th at pp. 643-645.) The court observed that "[e]ven commentators who represent the insurance industry recognize that the broadening of the pollution exclusion was intended primarily to exclude traditional environmental pollution rather than all injuries from toxic substances." (*Id*. at p. 644.)

The court rejected the insurer's contention that the pesticides were "'irritant[s]'" or "'pollutant[s]'" and the spraying was a "'discharge'" or "'dispersal,'" describing as a "basic fallacy" that the dictionary definition of a single term, such as "'irritant'" or "'discharge,'" would show how a layperson would reasonably interpret the exclusion. (*MacKinnon, supra*, 31 Cal.4th at p. 649.) The court added that if the insurer's interpretation were accepted, there would never be coverage under the policy because

"[v]irtually any substance can act under the proper circumstances as an 'irritant or contaminant.'"[8] (*Id.* at p. 650.)

The court explained, "'The drafters' utilization of environmental law terms of art ("discharge," "dispersal," . . . "release," or "escape" of pollutants) reflects the exclusion's historical objective—avoidance of liability for environmental catastrophes related to intentional industrial pollution.'" (*MacKinnon, supra*, 31 Cal.4th at p. 653, quoting *Motorists Mut. Ins. Co. v. RSJ, Inc.* (Ky.Ct.App. 1996) 926 S.W.2d 679, 681.) The court concluded, "While pesticides may be pollutants under some circumstances, it is unlikely a reasonable policyholder would think of the act of spraying pesticides under these circumstances as an act of pollution." (*MacKinnon*, at p. 654.)

As in *MacKinnon*, the exclusion here applied to "[p]ollution caused directly or indirectly by the release, discharge, dispersal, seepage, migration, or escape of pollutants or contaminants."

---

[8] The Supreme Court observed, "[M]any courts have taken a position that the current pollution exclusion is not ambiguous in encompassing acts of negligence involving toxic substances—acts that are outside the scope of traditional environmental pollution. These courts tend to find the meaning of the key words, as defined in a dictionary, to unequivocally cover forms of contamination other than traditional environmental pollution." (*MacKinnon, supra*, 31 Cal.4th at p. 646.) The *MacKinnon* court rejected the broad definition in those cases, including *Peace v. Northwestern Nat. Ins. Co.* (1999) 228 Wis.2d 106, 110 [596 N.W.2d 429, 431], in which the Wisconsin Supreme Court found a similar pollution exclusion barred coverage for a tenant's action against a landlord for lead paint ingestion. (*MacKinnon*, at pp. 646-647.)

The only terms not found in the policy at issue in *MacKinnon* are "seepage" and "migration," which are used to describe the action that caused the pollution, and the addition of the term "contaminants" to the exclusion. The Policies defined "pollutants and contaminants" to have the same meaning as the term "pollutants" used in the *MacKinnon* policy: "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." But the Policies added the language "which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage . . . to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water, Pollution Control Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U.S. Environmental Protection Agency."

Insurers contend the "widespread dispersal and migration" of the COVID-19 virus, as alleged, caused the losses JRK claims, thus falling within the pollution exclusion. But as the *MacKinnon* court found, terms like dispersal or migration have technical definitions in the context of environmental pollution, and they therefore apply to specific types of dispersal and migration. With respect to the term "dispersal," for example, when used "in conjunction with 'pollutant,' [it] is commonly used to describe the spreading of pollution widely enough to cause its dissipation and dilution." (*MacKinnon, supra*, 31 Cal.4th at p. 651; see *County of Maui v. Hawaii Wildlife Fund* (2020) __ U.S. __, 140 S.Ct. 1462, 1469 [the Clean Water Act "defines the term 'discharge of a pollutant' as "'any addition of any pollutant to navigable waters . . . from any point source"'"]; 33 U.S.C.

24

§ 1362(16) [defining "'discharge'"]; 42 U.S.C. § 9605(c)(2) ["[T]he President shall take into account the potential migration of any hazardous substance or pollutant or contaminant through such surface water to downstream sources of drinking water."].)

Unlike the dictionary definition, the reasonable interpretation of "dispersal" in the environmental pollution context does not encompass the spread of a virus resulting from people simply breathing and touching surfaces. (See *Northwell Health, Inc. v. Illinois Union Ins. Co.* (S.D.N.Y. Mar. 29, 2022, No. 20-CV-6893-LTS-OTW) 2022 U.S. Dist. Lexis 57432, *13 ["A sick patient's delivery of COVID-19 into one of Northwell's hospitals or other medical facilities 'by merely breathing, speaking, or touching objects and surfaces,' . . . or 'through some medical procedures,' . . . cannot reasonably be characterized as constituting the 'discharge, dispersal, release, escape, migration, or seepage' of any 'waste materials.'"].)

Notwithstanding *MacKinnon*, Insurers contend the inclusion of "virus" within the definition of "pollutant or contaminant" makes clear the pollution exclusion applies here, citing out-of-state cases declining to limit pollution exclusions to traditional environment pollution where the exclusion defines a pollutant or contaminant to include a "virus." For example, Insurers rely on *Northwell Health, Inc. v. Lexington Ins. Co.* (S.D.N.Y. 2021) 550 F.Supp.3d 108, 121 (*Northwell*), in which the district court applied New York law to a policy provision excluding "'loss or damage caused by . . . actual, alleged or threatened release, discharge, escape or dispersal' of 'contaminations or pollutants,' and defin[ing] contamination to include disease-causing microorganisms, bacteria, and viruses." (*Ibid.*) Although the court acknowledged New York case law

25

holding the terms "'discharge'" and "'dispersal'" used in a pollution exclusion were "terms of art in environmental law," citing *Belt Painting Corp. v. TIG Ins. Co.* (2003) 100 N.Y.2d 377, 386-390 [795 N.E.2d 15], the court declined to limit the exclusion to environmental or industrial pollution because the term "contaminants" was defined to include viruses. (*Northwell*, at p. 121.)[9]

Insurers also rely on *Zwillo V, Corp. v. Lexington Ins. Co.* (W.D.Mo. 2020) 504 F.Supp.3d 1034, 1041 (*Zwillo*), which applied Missouri law in concluding losses from the spread of the COVID-19 virus were covered by an exclusion for "loss or damage caused by . . . actual, alleged or threatened release, discharge, escape or dispersal of contaminants or pollutants." (Capitalization omitted.) The exclusion defined "contaminants or pollutants" to include any "virus." (*Ibid.*) The court declined to limit the exclusion to "traditional environmental and industrial pollution," explaining, "Missouri precedent directs a different result because

---

[9] In *Belt Painting Corp. v. TIG Ins. Co., supra*, 100 N.Y.2d at page 387, the New York Court of Appeals held an insurance policy's pollution exclusion did not apply to personal injuries caused by indoor exposure to paint fumes because "the terms used in the exclusion to describe the method of pollution—such as 'discharge' and 'dispersal'—are 'terms of art in environmental law with reference to damage or injury caused by disposal or containment of hazardous waste.'" The court reasoned, "Even if the paint or solvent fumes are within the definition of 'pollutant,' the exclusion applies only if the underlying injury is caused by 'discharge, dispersal, seepage, migration, release or escape' of the fumes. It cannot be said that this language unambiguously applies to ordinary paint or solvent fumes that drifted a short distance from the area of the insured's intended use and allegedly caused inhalation injuries to a bystander." (*Id.* at pp. 387-388.)

the exclusion at bar includes 'virus' as a part of its definition." (*Ibid.*)  Finally, Insurers rely on *Circus Circus LV v. AIG Specialty Ins. Co.* (D.Nev. 2021) 525 F.Supp.3d 1269, 1277-1278, affd. (9th Cir. Apr. 15, 2022, No. 21-15367) 2022 Lexis 10298 (*Circus Circus*), which considered under Nevada law an exclusion like the one in *Zwillo* and concluded because COVID-19 was a virus, the exclusion barred coverage.[10]

The exclusions at issue in *Northwell*, *Zwillo*, and *Circus Circus* differ from the pollution exclusion at issue here in that all three exclude "'loss or damage'" caused by the "'release, discharge, escape, or dispersal'" of contaminants (or contaminations) or pollutants, with contaminants defined to include a virus.  (*Northwell, supra*, 550 F.Supp.3d at p. 121; *Zwillo, supra*, 504 F.Supp.3d at p. 1041; *Circus Circus, supra*, 525 F.Supp.3d at p. 1277, affd. (9th Cir. Apr. 15, 2022, No. 21-

---

[10]     Insurers also rely on out-of-state authority interpreting exclusions for "contaminants," defined to include a virus, as examples of exclusions barring coverage for COVID-19.  (See, e.g., *OTG Management PHL LLC v. Employers Ins. Co. of Wausau* (D.N.J. 2021) 557 F.Supp.3d 556, 566; *Ascent Hospitality Management Co., LLC v. Employers Ins. Co. of Wausau* (N.D. Ala. 2021) 537 F.Supp.3d 1282, 1288-1289, affd. (11th Cir. 2022, No. 21-11924) 2022 Lexis 1161.)  These cases provide no guidance on applicability of pollution exclusions with environmental dispersal language where the terms pollutant and contamination are defined to include a virus.  *In-N-Out Burgers v. Zurich American Ins. Co.* (9th Cir. Mar. 10, 2023, No. 22-55266) __F.4th__ [2023 Lexis 5728] is also distinguishable because the contamination exclusion at issue there made no reference to pollution and applied to "'any condition of property due to the actual presence of any foreign substance, . . . virus, . . . mold or mildew.'"  (*Id*. at *2.)

15367) 2022 Lexis 10298.) By contrast, the policy here more closely tracks the pollution exclusion in *MacKinnon*, excluding "pollution" (not loss or damage) caused by the "release, discharge, dispersal, seepage, migration, or escape of pollutants or contaminants," with a specific reference to the Clean Air Act and CERCLA. This distinction is significant because none of the three cases cited by Insurers analyzes how the term virus is used in the context of a pollution exclusion (that is, whether a reasonable person would consider the spread of a virus due to humans breathing and touching objects to be a form of dispersal of pollution).

There is no question that COVID-19 is a virus, just as there was no question the pesticide in *MacKinnon* could be considered an "irritant" or a "contaminant." (*MacKinnon, supra*, 31 Cal.4th at pp. 650-652 ["Virtually any substance can act under the proper circumstances as an 'irritant or contaminant.'"]; *id.* at p. 654 ["pesticides may be pollutants under some circumstances"].) Rather, under *MacKinnon*, the appropriate inquiry in interpreting the pollution exclusion is whether *pollution* caused by the release, discharge, or dispersal of a virus in the ordinary sense of those terms encompasses the spread of a virus due to the normal human activities of breathing and touching surfaces. (See *MacKinnon, supra*, 31 Cal.4th at p. 649.) It does not. Just as a reasonable policyholder would not consider the spraying of pesticides in an apartment building the dispersal of pollution under the policy in *MacKinnon*, a reasonable policyholder would

28

not consider the dispersal of the COVID-19 virus from natural human activity to be pollution.[11]

Our interpretation of the pollution exclusion not to include the spread of the COVID-19 virus does not render the inclusion of the term "virus" in the exclusion meaningless. There are other scenarios in which the dispersal of a virus would fall within the pollution exclusion. For example, if an environmental disaster at a plant causes the release of virus-laden sewage into the surrounding area, the spread of the virus would likely fall within the exclusion as "pollution" caused by the discharge, dispersal, or release of a "pollutant or contaminant."

Insurers' effort to distinguish *MacKinnon* on the ground that in *Shusha* and *Marina Pacific* we referred to the COVID-19 virus as a form of contamination also fails. (See *Shusha, supra*, 87 Cal.App.5th at p. 253; *Marina Pacific, supra*, 81 Cal.App.5th at p. 112.) Our isolated use of the word "contamination" in a different context (describing alleged contamination that caused

---

[11]    We also reject Insurers' contention the Policies' "broad" pollution exclusion is analogous to virus exclusions, which courts applying California law have found bar coverage for losses from COVID-19. (See e.g. *Musso & Frank Grill Co., Inc. v. Mitsui Sumitomo Ins. USA Inc., supra*, 77 Cal.App.5th at p. 761 [virus exclusion "expressly bars coverage for all loss or damage caused by or resulting from 'any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease'"]; *Mudpie, Inc. v. Travelers Casualty Insurance Company of America* (9th Cir. 2021) 15 F.4th 885, 893 [applying policy exclusion "for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.'"].) The typical virus-exclusion language differs sharply from the pollution exclusion at issue here.

physical damage) is not relevant to interpretation of the definition of "pollutant or contaminant" as used in the pollution exclusion.

Insurers also fail to articulate why, as they contend, interpretation of a pollution exclusion in a business interruption policy (at issue here) should differ from interpretation of the same exclusion used in a CGL policy, at issue in *MacKinnon*. Interpretation of both types of policies involves consideration of whether a reasonable policyholder would believe the dispersal resulted from pollution. (*MacKinnon, supra*, 31 Cal.4th at p. 654; see *Minkler v. Safeco Ins. Co. of America, supra*, 49 Cal.4th at p. 321 ["'If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect "'the objectively reasonable expectations of the insured.'"'"]; *The Villa Los Alamos Homeowners Assn. v. State Farm General Ins. Co.* (2011) 198 Cal.App.4th 522, 535 [holding with respect to coverage for injuries from asbestos pollution, *MacKinnon*'s interpretation of a pollution exclusion in a standard CGL policy applied to a first party property insurance policy, explaining "a reasonable insured would expect both exclusions to apply to environmental pollution"].)

2. *The pathogen exclusions bar coverage*

JRK contends the RSUI and Evanston policies' pathogen exclusions should be interpreted narrowly under *MacKinnon's* reasoning because the RSUI exclusion uses the "discharge" or "dispersal" terms of art and the Evanston exclusion defines "organic pathogens" as "irritants or contaminants." We do not read *MacKinnon* so broadly.

30

As discussed, *MacKinnon* focused on the fact the dispersal language used in the pollution exclusion was the same language historically used to describe environmental pollution, reasoning the inclusion of the language was intended to limit insurers' liability for the expanding costs of environmental remediation. (*MacKinnon, supra*, 31 Cal.4th at pp. 643-645.) But as the Supreme Court cautioned, the terms "'discharge, dispersal, release or escape,' by themselves," may not be "environmental law terms of art" unless "used in conjunction with 'pollutant.'" (*Id*. at p. 653.)

There is no reference in the RSUI or Evanston virus exclusions to pollution. Rather, RSUI's exclusion applied to losses or damage caused by "the discharge, dispersal . . . or application of any pathogenic or poisonous biological or chemical materials." And the Evanston exclusion applied to losses or damage caused by the "[p]resence, growth, proliferation, or spread of any 'organic pathogens,'" defining "organic pathogen" to include a "virus." Although RSUI's exclusion uses the four traditional discharge terms of art from *MacKinnon*, it does not follow that use of those terms without any reference to pollution limits the exclusion to environmental pollution. And the Evanston virus exclusion uses neither the pollution nor dispersal language.

Further, Evanston's exclusion explicitly defines an "organic pathogen" to include a "virus." Although the RSUI exclusion does not define "pathogenic . . . materials," the term "pathogenic" is defined as "causing or capable of causing disease." (Merriam-Webster's Online Dict. (2023) <https://www.merriam-webster.com/dictionary/pathogenic> [as of September 28, 2023], archived at <https://perma.cc/YEZ8-WR8Y>.) Similarly,

31

"pathogen" is defined as "a specific causative agent (such as a bacterium or virus) of disease." (Merriam-Webster's Online Dict. (2023) <https://www.merriam-webster.com/dictionary/pathogen> [as of September 28, 2023], archived at <https://perma.cc/F793-Y68T>.) COVID-19 aerosols and droplets expelled from humans and capable of creating infectious fomites, as alleged in the complaint, are therefore unambiguously "pathogenic materials" or "pathogens."

Other courts have similarly interpreted the term "pathogenic," as used in pathogen exclusions, to cover losses from COVID-19. (See *Glynn Hospitality Group, Inc. v. RSUI Indemnity Co.* (D.Mass. Nov. 12, 2021, No. 21-cv-10744-DJC) 2021 U.S. Dist. Lexis 218885, at \*5, \*8-9 [citing Merriam-Webster's definitions of "pathogen" and "pathogenic" and concluding under Massachusetts law the pathogen exclusion's "plain language applie[d] to loss or damage caused by COVID-19"]; *id.* at \*24 ["the Pathogen Exclusion plainly applies to the discharge, dispersal or release of 'pathogenic' material—as opposed to pollutants generally—which is the circumstance here"]; *Till Metro Entertainment v. Covington Specialty Ins. Co.* (N.D. Okla. 2021) 545 F.Supp.3d 1153, 1166 [concluding under Oklahoma law with respect to an exclusion identical to the RSUI pathogen exclusion that "the ordinary and plain meaning of 'pathogenic . . . materials' includes COVID-19"].)

The Evanston pathogen exclusion, specifically barring coverage for losses from a virus, likewise precludes coverage for COVID-19. (See *L&L Logistics and Warehousing Inc. v. Evanston Ins. Co.* (E.D. Va. 2021) 533 F.Supp.3d 299, 305 [finding Evanston's pathogen exclusion under California law "quite clearly excludes viruses from the realm of 'covered causes,'

even where the loss or damage was only indirectly caused by a virus"].)

As to both pathogen exclusions, JRK contends that interpreting them to bar COVID-19 coverage is inconsistent with the Policies' communicable disease coverage. However, the communicable disease coverage provision does not apply to the policies JRK negotiated with Evanston and RSUI. The Policies limited coverage for communicable diseases to a $2.5 million sublimit "per occurrence," but the Evanston and RSUI policies provided excess coverage only for losses per occurrence above $10 million. Likewise, JRK's argument that an ambiguity is created by the lack of a virus exclusion lacks merit because there is no inconsistency—given the pathogen exclusions that applied to viruses, there was no need for a virus exclusion.

The trial court did not err in concluding the RSUI and Evanston pathogen exclusions unambiguously preclude coverage for losses from COVID-19, and the court did not abuse its discretion in denying leave to amend as to these two insurers.

## DISPOSITION

The order of dismissal is reversed except as to RSUI and Evanston. The matter is remanded for the trial court to vacate its order granting the motion for judgment on the pleadings and to enter a new order granting the motion without leave to amend as to RSUI and Evanston and denying the motion as to all other defendants. JRK is to recover its costs on appeal with respect to Insurers except for RSUI and Evanston. RSUI and Evanston are to recover their costs on appeal.

FEUER, J.

We concur:

PERLUSS, P. J.

MARTINEZ, J.